FANNIE GROCE, BY HER NEXT FRIEND, M. C. GROCE, v. DR. DWIGHT L. MYERS.

(Filed 29 March, 1944.)

**1. Physicians and Surgeons § 15d: Evidence § 45a—**

In cases where the physician's or surgeon's want of skill or lack of care is so gross as to be within the comprehension of laymen and to require only common knowledge and experience to understand and judge it, expert evidence is not required.

**2. Physicians and Surgeons §§ 14, 15b—**

It is required of a physician, who has undertaken the care and treatment of a patient, not only that he have a reasonable amount of the knowledge and skill he holds himself out to have, but that he use it in the treatment of the patient.

**3. Physicians and Surgeons § 12—**

After the relation of physician and patient has been established, unless otherwise limited in the contract of employment, it cannot be terminated at the mere will of the physician, but must last until treatment is no longer required, or until dissolved by mutual consent or reasonable notice.

**4. Physicians and Surgeons § 15e—**

In an action to recover damages for malpractice against a physician, where all the evidence tended to show that plaintiff, a patient in defendant's hospital and admittedly in an insane condition, got under her bed and could not be removed by the nurses, whereupon defendant took hold of her arm and pulled so hard that he heard the bone break, and failed to reduce or immobilize the fracture in a reasonable time, but sent for her father and delivered her to him, declining to treat her further, there was error in sustaining a motion for judgment as of nonsuit.

APPEAL by plaintiff from *Pless, J.,* at November Term, 1943, of YADKIN.

*Allen & Henderson, Hall & Zachary, and J. T. Reece for plaintiff, appellant.*

*J. Laurence Jones and Trivette & Holshouser for defendant, appellee.*

SEAWELL, J.   The plaintiff, by her next friend, brought this action to recover damages of the defendant, a practicing physician, for the alleged malpractice and injuries inflicted upon her while a patient at his hospital at Harmony, North Carolina, known as Dr. Myers' Clinic.   The evidence on both sides is entirely too voluminous for full transcription here.   For the purposes of this decision, the following brief outline must suffice :

The plaintiff, after having spent two weeks at some prior time at the same hospital, was carried to Dr. Myers' Clinic about 19 June, 1941, and remained there for about eight days.   She had been suffering with dysmenorrhea and difficult menstruation since the time of puberty, and had now reached the age of thirty-three years.   There is evidence to the effect that she had spells as the menstrual period approached, but that otherwise her mental condition was good.   She had gone to the seventh or eighth grade in school, and her school work was satisfactory.   She was able to take care of herself, to do house work, to quilt, to make her own clothes, to help raise and take care of tobacco.

Members of her family visited her while in Dr. Myers' hospital some time after her arrival there, and testified that she was bright, smiling and in good condition.

Later, upon a call from Dr. Myers, her father, two brothers and sister went to the hospital, found her in a highly nervous and disturbed mental condition, having lost her faculties to such extent that she failed to recognize some members of the family.   There were bruises of an aggravated nature all over her body, upon her face, body, hips, and limbs.   Her arm had been broken, was swollen to an enormous size and hanging down by her body.

Dr. Myers, the witnesses said, stated to them that Fannie, the plaintiff, had been under the bed and that in trying to pull her out from under the bed, he had broken her arm, that he heard it snap.   The arm had been in this condition for some days, and the father inquired what he should do about it, and was told just to tie something around it and let it hang down.   There was no tape, gauze, dressing or anything else upon the arm. Dr. Myers, as these witnesses testified, upon request of the father that something should be given her to ease her pain, gave him a bottle of chloral hydrate, without instructions as to the dosage, and also some tablets.   As the chloral hydrate was marked poison, it was not used.

Upon taking the plaintiff home, the bruises upon her body, as well as her face, particularly the jaws, were examined, and the testimony is to the effect that the flesh on the arm was black, was swelled near to bursting, and that the bruises on the body, which were numerous, were the width of three fingers, and black and green.

The plaintiff was carried to Chatham Hospital, where an X-ray was made of the arm and it was put in a cast, in which it remained for a month.

Further testimony for the plaintiff was to the effect that whereas the mental condition of the plaintiff had been reasonably good, notwithstanding her spells, up to the time of her stay in the Myers' Clinic, she was found practically insane thereafter, and now at times had to be tied or kept in a wire cage; that she now had delusions that she was fighting Dr. Myers and exhibited fear of injury.

Dr. Beale, an expert physician, testified for plaintiff that he had examined Miss Groce, plaintiff, and had found upon her such bruises as were testified to by her family, and that her arm had been broken and was swollen as described, and had recommended that she be taken immediately to Chatham Hospital. He also testified that he had treated the plaintiff over a period of about two years for dysmenorrhea and painful menstruation at some time prior to her admission into the Myers' Clinic; that she was highly nervous at such times, but otherwise seemed to be in good mental condition.

He identified the X-ray picture made at Chatham Hospital and interpreted it to the jury, indicating that because of the failure to reduce the fracture, there was a malformation at the broken place which interfered with the free movement of the arm, and was calculated to injure the surrounding tissue and produce pain.

The witness further stated that the accepted practice in treatment of fractures such as he had described was to reduce the fracture and immobilize it—to reduce it as soon as possible. He then described the results of the failure to immobilize the fracture and the failure of a perfect union.

Dr. Beale stated that at the time he had seen Fannie, the plaintiff, the fracture had existed more than twenty-four hours.

Dr. J. R. Finney, admitted to be an expert, a witness for the plaintiff, stated that he was called to the Groce home about the 27th or 28th of June to treat the plaintiff and examined her. He found that there was a fracture of the humerus, or shoulder joint, and found that there was crepitus, or a peculiar noise you feel rather than hear, of the bones. The arm was blue and some areas getting to be yellow; the arm was swollen very much. He recommended that she be carried immediately to the hospital. As to the reduction of the fracture, he stated that it should be done as soon as possible after it occurred by setting or immobilization of the parts; otherwise, there would be a trauma of the soft tissue surrounding the bone. The witness was of the opinion that such a fracture should be X-rayed and set under a fluoroscope immediately.

The witness stated that some time afterwards he had a conversation with Dr. Myers, who told him how the accident occurred. Dr. Myers stated that the girl was off the bed and under it, and the nurses could not handle her; that he reached under the bed and got her by the arm and

pulled until he heard a pop, and stated that he did not go any further with that because she refused to have him put a dressing on.

The accepted practice, witness stated, when a person has a fracture and does not agree for the doctor to set the broken limb, is at times to administer anesthesia, and then again force enough to hold the patient quiet while the fracture is set and bandage applied.

For the defendant, Dr. J. R. Saunders, Superintendent of the State Hospital at Morganton, stated that some years prior to this the plaintiff had been admitted to the Morganton Hospital, and that a record had been made of her condition at that time. He stated that in his opinion she was suffering from dementia praecox which had probably set in at the age of puberty; and that while in the hospital she exhibited hallucinations and delusions, and was violent.

The defendant, testifying for himself, stated that the plaintiff, after admission into the hospital, became increasingly violent, making grotesque motions, stabbing at the walls with the tableware, tearing out the electric light, refusing to take her medicine, and becoming frightening to the nurses. He stated that there were a number of patients in the hospital, who were disturbed by the noise made by the plaintiff, and that finally she became so unruly that upon a call from the nurse, he went to her room and attempted to quiet and control her; that she was under the bed, and in his attempt to get her out, he pulled her by the arm, with the result that the arm was broken. That he sent for the father of the patient and advised him to take her out of the hospital, as he could no longer take care of her. He stated that he was not prepared to handle a case of that sort.

There is much other evidence, which we do not find it necessary to record.

At the conclusion of the plaintiff's evidence, and again at the conclusion of all the evidence, the defendant moved for judgment as of nonsuit. This was declined at the termination of the plaintiff's evidence, but was allowed at the conclusion of all the evidence. The plaintiff appealed, assigning error.

In taking the case from the jury, the eminent trial judge remarked: "I don't conceive it to be the law, if doctors cannot agree, to ask the jury to agree on the case." Students of this branch of jurisprudence are not unfamiliar with the doctrine the judge probably had in mind. Applying it in extreme form, it has sometimes been held that no verdict affirming malpractice could be rendered in any case without the support of expert medical opinion. Any case must be articulated from the facts. The inhibition is not against the admission of nonexpert testimony, since lay witnesses are only permitted to give factual testimony; it is against con-

clusions by the jury, who are themselves laymen, upon the facts in evidence. Between the postulated facts and the rationalization by the jury, there could be no commerce except in the presence of the professional catalytic. Here it is suggested that the failure of expert witnesses to be in substantial accord lets the jury out of the picture altogether.

In cases involving the application of scientific knowledge peculiar to that branch of learning, there is no question that the rules of evidence requiring expert opinion in matters of scientific knowledge ought to be carefully enforced, both in the interest of justice and in the protection of a profession peculiarly liable to suit when, after exhausting every known resource and applying the highest degree of skill, the result is not what the patient or friends desire or hoped for. It is often said that the physician does not insure the result; and that is simply to say that he is not God, and does not hold in his hand all the issues of life. But often the difficulty of establishing malpractice does not arise out of rules requiring the evidence of experts as to matters of peculiarly scientific learning and practice. Often the reason has nothing particularly to do with the question of scientific knowledge or skill in its application, but rather the contrary. It is the reluctance to permit the jury to draw inferences from the facts because of what has been long regarded as the peculiar nature of medical knowledge and practice, which amongst the professions makes it *sui generis* in the face of challenge. The usual argument which has relegated the decision of malpractice cases to the opinion of professional men, and thence to the court, as distinguished from the jury, is that the practice of medicine and surgery is empiric— which means that it has not yet become a matter of scientific knowledge or proceeding. The implication is that only a doctor can know from his own actuarial or statistical experience, or that of others handed down to him, what is good or bad practice in any case. On this theory the doctor, instead of being an expert in scientific learning and methods, is an expert in the trial and error results which are nowhere available except in the arcana of the profession. Many opinions afford a curious blending of views as to the scientific and empiric status of the profession, with consequent confusion as to the result.

There are few fields of human endeavor which in recent years have shown greater advancement in scientific information and the application of scientific methods than the practice of medicine and surgery. Perhaps no skilled profession has achieved a higher standard of excellence in its work or has uniformly produced more remarkable results. Science literally rules in that vast field, rather than the empiric standards which have formerly proved helpful without any particular scientific understanding of the reason why.

One of the incidental obligations of science imposed on professional men is that they shall be judged by the standards of the science they profess, and not wholly by empirical standards, vague and indefinite, and incapable of scientific expression, behind which may lurk charlatanry and quackery..

Thus in the most recently collected authorities, the empiric basis of complete cloture is wholly lacking. They stress the necessity of enforcing the rule against the admission of lay opinion on matters peculiarly within the domain of expert scientific knowledge which belongs to the profession. They follow the general rule which, in the nature of things, has a wide coverage and regard malpractice ordinarily as unproved, or totally wanting in evidence, when such expert testimony is lacking. But they uniformly recognize exceptions to the rule—or rather, recognize instances where the rule is inapplicable—where the facts are so clearly within the common knowledge and experience of laymen that they may be reasonably interpreted by the jury.

The commentator in the annotations to *Richeson v. Roebber,* 141 A. L. R., 1, loc. cit. 12, says "There is abundant authority for the view that in cases where the physician's or surgeon's want of skill or lack of care is so gross as to be within the comprehension of laymen and to require only common knowledge and experience to understand and judge it, expert evidence is not required."

Among the numerous cases cited and quoted under this text we call attention, without further elaboration, to *Nicholas v. Jacobson,* 113 Cal. App., 382, 298 P., 505; *Farrah v. Patton,* 99 Colo., 41, 59 P. (2d), 76; *Boyce v. Brown,* 51 Ariz., 416, 77 P. (2d), 455; *Marangian v. Apelian,* 286 Mass., 429, 190 N. E., 729; *Covington v. James,* 214 N. C., 71, 197 S. E., 701.

In the case at bar there were two outstanding features which must be separately considered: The first is the evidence that the defendant, while his patient was admittedly in an insane condition, applied such force to her arm—"jerked" it, as one witness said the admission of the doctor was—as to break it. No reasonable person would contend that the breaking of the patient's arm was either necessary or desirable in treating her for her dysmenorrhea, nervousness or insanity. The factual particulars with regard to the breaking of the arm—the force used and the circumstances under which it was used—are matters for the jury. If these facts are all established contrary to the contentions of the defendant, what follows? In the face of an extraordinary occurrence like this, may the jury draw no inference adverse to the defendant on the issue of malpractice because of the absence of expert testimony?

The second item of evidence refers to the treatment of the plaintiff after the arm had become broken—the failure to immobilize or set the

limb immediately or within a reasonable time after it had been broken, to the knowledge of the defendant. Various reasons were stated by the defendant as to why this was not done, but we are considering the evidence of the plaintiff. That evidence is that the limb was not immobilized, the bones not set, nor the fracture reduced, for an extended period while the patient was still in the care of the defendant; and upon her being taken away from the hospital by her father and relatives, the defendant advised them to wrap a cloth around the arm and let it hang. As to this phase of the alleged malpractice there is, however, expert medical testimony from which inference may be drawn condemnatory of the practice. For that reason we enter into no controversial discussion as to the extent to which the breaking of the arm might speak for itself.

It is required of a physician who has undertaken the care and treatment of a patient not only that he have a reasonable amount of the knowledge and skill he holds himself out to have, but that he use it in the treatment of the patient—make it available to the patient. After the relation has been established, unless otherwise limited in the contract of employment, it cannot be terminated at the mere will of the physician, but must last until the treatment is no longer required, or until it is dissolved by the consent of the parties, or until reasonable notice is given in order that the patient may have an opportunity to engage the services of another. *Nash v. Royster,* 189 N. C., 408, 127 S. E., 356, Anno. 56 A. L. R., 819; *Stohlman v. Davis* (Neb.), 220 N. W., 247, 60 A. L. R., 658, Anno. 664. In addition to what we have said, some aspects of the evidence may give rise to an inference of abandonment for which, if it actually occurred, defendant would be liable.

We see no point in taking the case away from the jury because the doctors could not agree. The decision is not for them, nor is the verdict of the jury an opinion. It is the determination of the truth from the evidence. In controversies about inventions and patents, about delicate and complicated machinery, about construction and engineering practices, and in dozens of other matters about which the unaided juror knows little or nothing, where disagreement often exists amongst the experts, the jury has the final say. The case at bar may be conceived to be somewhat simpler.

Taking the evidence in the most favorable light to the plaintiff, she was entitled to have it submitted to the jury.

The judgment sustaining the motion for judgment as of nonsuit is

Reversed.