JAMES H. JACKSON, ADMINISTRATOR OF THE ESTATE OF JUDITH LANE JACKSON, DECEASED, v. MOUNTAIN SANITARIUM AND ASHEVILLE AGRICULTURE SCHOOL, A CORPORATION; DR. T. H. JOYNER, AND EDGAR A. HANSON.

(Filed 10 October, 1951.)

**1. Hospitals § 8—**

In this action for malpractice, nonsuit as to defendant hospital is affirmed on authority of *Wilson v. Hospital,* 232 N.C. 362.

**2. Hospitals § 10—**

In this action for malpractice, nonsuit as to the anesthetist affirmed on authority of *Byrd v. Hospital,* 202 N.C. 337.

**3. Trial § 17—**

Error in the exclusion of evidence competent for a restricted purpose is not cured because the evidence was offered generally, it being the duty of the opposing party to request that its admission be restricted if he so desires.

**4. Physicians and Surgeons § 14—**

A physician or surgeon must (1) possess the degree of learning, skill, and ability which others similarly situated possess; (2) must exert his best judgment in the treatment and care of his patient; (3) and must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case.

**5. Physicians and Surgeons § 16—**

Where plaintiff, in an action for wrongful death resulting from alleged malpractice, relies upon the failure of defendant surgeon to exercise reasonable care and diligence in the application of his knowledge and skill, plaintiff must not only show that defendant was negligent in this respect but also that such negligence was the proximate cause, or one of the proximate causes, of the death of his intestate.

**6. Same—**

Ordinarily the standard of care required of a physician or surgeon can be established only by expert testimony, but when such standard is established by expert testimony, nonexpert witnesses may testify in most cases as to a departure therefrom.

**7. Same—**

Where the evidence is to the effect that a person allergic to ether dies from its use almost immediately, and that in the instant case plaintiff's intestate lived approximately twenty hours after ether was administered, the question of whether intestate died as the result of an abnormal reaction to the ether is eliminated.

**8. Same—In proper instances the jury may determine question of proximate cause from facts and circumstances without aid of expert testimony.**

Plaintiff introduced medical expert testimony to the effect that it is not good medical practice to administer ether or operate while the patient has

a cold, together with medical expert testimony that it is not good medical practice to leave a patient unseen for five or six hours after an operation, with lay testimony to the effect that defendant surgeon was advised that his patient, plaintiff's intestate, had a cold but that defendant nevertheless operated, and that he did not visit intestate for some five or six hours after the operation, with further expert testimony that death resulted from cerebral edema due to anoxia. *Held:* The evidence is sufficient for the jury to determine the question of proximate cause as an inference from the facts and circumstances shown in evidence, and therefore an instruction to the effect that if it did not appear from the evidence that intestate would not have died if defendant or some competent physician or a nurse had been with her after the operation, there would be no evidence of proximate cause, is error as requiring medical expert testimony as the sole method of establishing this essential element.

VALENTINE, J., took no part in the consideration or decision of this case.

APPEAL by plaintiff from *Patton, Special J.,* February Term, 1951, BUNCOMBE.

Civil action to recover damages for the alleged wrongful death of plaintiff's intestate.

Pursuant to arrangements made the preceding day, defendant Joyner performed a tonsillectomy on plaintiff's intestate on the morning of 20 December 1948. She was carried to the operating room about 9:30 a.m. Although the operation was completed about 10:30, she was not taken to her room until about 11:30. At that time she was in a comatose state. She continued in that state until about 5:45 a.m., 21 December, when she died. After reaching her room, she did not move until spasms set in later. She was hot and feverish, her temperature going up to 107. Although the child's mother made repeated efforts through the nurses to get in touch with Dr. Joyner, he did not visit the patient until about 5:15 p.m. He then did nothing for her—just stood and looked at her about five minutes. Glucose was administered about 5:30 under Dr. Joyner's orders. He returned about 7:00 p.m. The patient was then having spasms. He did nothing then, but returned about 9:00 or 9:30. The nurses began to give oxygen about 7:40. Dr. Joyner returned about 12:00 midnight. He left the hospital for home to get some rest about 2:30 a.m. The mother asked him why he did not come and attend to Judith. He said he was so busy he just did not have the time to attend to her.

On 19 December the mother told the doctor Judith had a cold and her nose was running. He said he would have to operate the next day because he was leaving town, and it did not matter that she had a cold. She told him she wanted her doctor to administer the anesthetic. He said no: they had a man—Edgar Hanson—to do the work and he would use him.

Hanson administered the anesthetic and later went to the patient's room about 3 :00 p.m. He took Judith and "pitched her up."

It is not good medical practice to leave a patient unseen for a period of five or six hours after an operation. The doctor should see that the patient is in good condition. It is bad medical practice to administer ether and operate while the patient has a cold. He is apt to die a typical anesthesia death. It is very hazardous because it is very likely to cause the infection to spread into the lungs, causing either pneumonia or a collapse of the lungs.

After death the lungs of plaintiff's intestate revealed rather numerous areas where the air sacs were filled with pus cells. Pus also appeared in the bronchial tubes. There was evidence of limited pneumonia and also edema.

A person who is allergic to ether dies from its use almost immediately—sometimes even before an incision can be made.

Post-operative hyperthermia follows convulsions due mostly to ether. When a patient remains in a comatose state for more than one and one-half or two hours after ether is administered, there is cause for alarm. The physician should immediately begin the use of oxygen, examine the patient for shock, and take other precautions, keeping in constant touch with the patient.

Plaintiff's intestate died from cerebral edema due to anoxia, that is, lack of oxygen. This was in all probability due to anesthesia.

These facts in substance constitute outstanding features of the evidence offered by the plaintiff. The evidence offered by defendant was in many respects in sharp conflict. However, the questions raised on this appeal require a consideration of the evidence in the light most favorable to plaintiff.

The court entered judgment as in case of nonsuit as to all the defendants except Dr. Joyner. As to him, appropriate issues were submitted to the jury. They, for their verdict, found that the death of plaintiff's intestate was not caused by the negligence of said defendant. From judgment on the verdict plaintiff appealed.

*W. W. Candler, Don C. Young,* and *Cecil C. Jackson* for *plaintiff appellant.*

*Smathers & Meekins* for *defendants Mountain Sanitarium and Asheville Agriculture School and Edgar A. Hanson.*

*Harkins, Van Winkle, Walton & Buck* for *defendant Dr. T. H. Joyner.*

BARNHILL, J. The record fails to disclose any evidence of sufficient probative force to require the submission of issues as against the corporate defendant. Hence the judgment of nonsuit as to it must be

affirmed. *Wilson v. Hospital,* 232 N.C. 362, 61 S.E. 2d 102, and cases cited. See Anno. 60 A.L.R. 147.

The judgment of nonsuit as to the defendant Hanson is sustained on authority of *Byrd v. Hospital,* 202 N.C. 337, 162 S.E. 738. What is there said is controlling here.

However, different questions are presented on plaintiff's appeal from the judgment on the verdict as to the defendant Joyner.

Dr. Peasley performed an autopsy on the body of plaintiff's intestate. He made a detailed written report of his findings. He identified this report. Thereafter, plaintiff offered it in evidence. Objection thereto was sustained. In this there was error. This error is not cured, as contended by the defendant, by the fact the plaintiff offered the report generally and not specifically for the purpose of corroboration. If the defendants desired the evidence to be so restricted, it was their duty to request the court to so instruct the jury.

In the course of its charge, the court below instructed the jury as follows:

"The Court instructs you, gentlemen of the jury, that if it does not appear that if the defendant or another physician or a competent nurse had been with the deceased, she would not have died or that her death was the result of her condition prior to the operation which could have been discovered by the defendant by any examination which it was his duty to make, then there would be lack of proximate cause."

This must be held for error.

In former decisions of this Court, we have fully discussed the requisite standard of learning and skill and the duty of a physician or surgeon who undertakes to render professional services to a patient. *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356; *Groce v. Myers,* 224 N.C. 165, 29 S.E. 2d 553; *Wilson v. Hospital, supra.* Briefly stated, it comes to this: (1) He must possess the degree of professional learning, skill, and ability which others similarly situated ordinarily possess; (2) he must exert his best judgment in the treatment and care of his patient; and (3) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case.

There is no evidence in the record tending to show that Dr. Joyner did not possess the requisite knowledge and skill. Plaintiff does not seriously contend to the contrary. His case is made to rest upon the allegation that said defendant, in treating plaintiff's intestate, failed to exercise reasonable care and diligence in the application of such knowledge and skill, and the evidence in support thereof. To make out his case he must not only prove that the defendant was negligent in this respect, but also that such negligence was the proximate cause, or one of the proximate causes, of the death of his intestate.

The court below, in the quoted excerpt from the charge, instructed the jury that there is a failure of proof of proximate cause unless it is made to appear (1) that if the defendant or another physician or a competent nurse had been with the deceased she would not have died, or (2) that her death was the result of her condition prior to the operation which could have been discovered by the defendant by an examination which it was his duty to make. Thus the court laid down the rule that in cases of this kind proximate cause can be established only through the medium of expert testimony and, in effect, eliminated "the greater weight of the evidence" rule as to the burden of proof which applies in civil cases. It must be made to appear by expert testimony that the defendant or another physician or a competent nurse, if present, would have saved the life of this child, or else there was no actionable negligence. There could be no commerce between the facts in evidence and the rationalization of the jury unless such facts were established by expert testimony. The jury must have so understood.

The courts generally recognize that the science of medicine is an experimental science and they have been extremely careful to protect physicians and surgeons against verdicts resting on non-expert testimony in those cases where non-expert testimony could constitute nothing more than mere conjecture or surmise and in which only an expert could give a competent opinion or draw a reliable inference. Yet this Court has not and could not go so far as to say that in no event may a physician or surgeon be held liable for the results of his negligence unless the causal connection between the negligence and the injury or death be established by the testimony of a brother member of defendant's profession. Indeed, we doubt that a physician or surgeon could be found who would be willing to testify unequivocally, in any case, that if he had been present he could have prevented the injury or death. In any event, such a rule would erect around the medical profession a protective wall which would set it apart, freed of the legal risks and responsibilities imposed on all others.

It is true it has been said that no verdict affirming malpractice can be rendered in any case without the support of medical opinion. If this doctrine is to be interpreted to mean that in no case can the failure of a physician or surgeon to exercise ordinary care in the treatment of his patient, or proximate cause, be established except by the testimony of expert witnesses, then it has been expressly rejected in this jurisdiction. *Groce v. Myers, supra; Wilson v. Hospital, supra; Covington v. James,* 214 N.C. 71, 197 S.E. 701; *Gray v. Weinstein,* 227 N.C. 463, 42 S.E. 2d 616.

Rightly interpreted and applied, the doctrine is sound. Opinion evidence must be founded on expert knowledge. Usually, what is the

standard of care required of a physician or surgeon is one concerning highly specialized knowledge with respect to which a layman can have no reliable information. As to this, both the court and jury must be dependent on expert testimony. Ordinarily there can be no other guide. For that reason, in many instances proximate cause can be established only through the medium of expert testimony. There are others, however, where non-expert jurors of ordinary intelligence may draw their own inferences from the facts and circumstances shown in evidence. *Groce v. Myers, supra; Buckner v. Wheeldon,* 225 N.C. 62, 33 S.E. 2d 480; *Mitchell v. Saunders,* 219 N.C. 178, 13 S.E. 2d 242; *Olinger v. Camp,* 215 N.C. 340, 1 S.E. 2d 870; *Pendergraft v. Royster,* 203 N.C. 384, 166 S.E. 285, 41 A.J. 243; Anno. 69 A.L.R. 1154; 129 A.L.R. 116.

When the standard of care, that is, what is in accord with proper medical practice, is once established, departure therefrom may, in most cases, be shown by non-expert witnesses.

Here the plaintiff, in the type of evidence offered, has met the test. What the approved practice and the approved treatment are under the circumstances disclosed by plaintiff's evidence, as well as the probable cause of death, have been established, at least *prima facie,* by expert testimony. Failure of the physician to follow the approved practice and administer the approved treatment with ordinary care and diligence is made to appear by lay testimony.

Plaintiff's expert testimony tends to show that it is bad practice to administer ether to a person who is suffering from a common cold. The intestate's mother informed the surgeon that the child then had a cold. It was not essential that plaintiff prove that the defendant failed to make an examination to discover what he already knew.

Due to allergy and the varying conditions of the human system, the reaction of a particular person to a specific drug is not always predictable. *Lippard v. Johnson,* 215 N.C. 384, 1 S.E. 2d 889. Ether, when administered in a careful manner and in acceptable dosage, may cause the death of the patient. In such cases, however, the patient will die almost instantly. Plaintiff's intestate lived approximately twenty hours. Thus, death from abnormal reaction in the nature of an allergy is eliminated.

It follows that plaintiff's evidence, standing alone, is fully sufficient to support the inference of actionable negligence. The weight and credibility of the defendant's evidence are jury questions. Whether it is sufficient to rebut the evidence offered by plaintiff is for the jury to decide. Hence, what inferences and deductions should be drawn from the testimony, when considered as a whole, was for the jury to decide, under proper instructions from the court.

The defendants on their appeal here cite and rely on *Smith v. Wharton,* 199 N.C. 246, 154 S.E. 12, and it is apparent the court below, in giving the quoted instruction, relied on what was there said. However, that decision does not warrant the interpretation accorded it by the defendants. It is true that *Connor, J.,* speaking for the Court in that case, said: "It does not appear that if defendant, another physician or a competent nurse had been with her, she would not have died, nor does it appear that her death was the result of her condition prior to the operation which could have been discovered by any examination which it was the duty of the defendant to make." But that is not laid down as an exclusive method of proof. Indeed, the opinion specifically states that the question whether plaintiff must resort to expert testimony to establish want of due care was not presented or decided. In so doing, the court used this language:

"We do not decide the question discussed in the briefs filed in this Court, as to whether in the absence of testimony of expert witnesses tending to show that defendant, a physician and surgeon, failed to exercise the care ordinarily required of men of his profession, with respect to patients under circumstances similar to those in the instant case, plaintiff was not entitled to recover in this action, for that there was no evidence from which the jury could find that he was negligent . . . We do not deem it wise to discuss or to decide the question until it shall be necessary for us to do so."

As to the corporate defendant and defendant Hanson: Affirmed.

As to defendant Joyner: New trial.

VALENTINE, J., took no part in the consideration or decision of this case.