HAYWOOD HARRIS, IN HIS CAPACITY AS ADMINISTRATOR OF THE ESTATE OF ETTA HARRIS v. GEORGE J. MILLER, M.D.

No. 902SC336

(Filed 2 July 1991)

1. **Physicians, Surgeons, and Allied Professions § 11 (NCI3d) — negligence of nurse anesthetist — respondeat superior — surgeon not liable**

   A directed verdict was properly granted for a surgeon on the issue of vicarious liability in a malpractice action where it was undisputed that the nurse anesthetist negligently caused the injury and that the nurse anesthetist was employed by the hospital. The captain of the ship doctrine under which all personnel in the operating room are unquestionably deemed to be the surgeon's employees is rejected; the test is whether the surgeon has the right to control the operating room personnel, and there is a distinction between the power to supervise and the power to control.

   **Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 287-289.**

   **Liability of operating surgeon for negligence of nurse assisting him. 12 ALR3d 1017.**

2. **Physicians, Surgeons, and Allied Professions § 11 (NCI3d) — negligence of nurse anesthetist — liability of surgeon — insufficient evidence**

   The trial court properly granted a directed verdict for defendant surgeon in an action arising from the undisputed negligence of a nurse anesthetist where the hospital policy manual, which gave the surgeon the power to supervise the nurse anesthetist during the operation, was insufficient to show

HARRIS v. MILLER

[103 N.C. App. 312 (1991)]

that the surgeon had the right to control the anesthetist's work; plaintiff offered no evidence that the surgeon personally selected the nurse anesthetist; there was no evidence that the surgeon had any responsibility for the assignment or training of nurse anesthetists; the consent form, by which the patient consented to surgery by "Dr. Miller and/or the assistants as may be selected by him" does not constitute evidence that the surgeon had the right to control the work and the manner of performing the work of the anesthetist; the testimony of six witnesses, including defendant, that the surgeon has the ultimate responsibility for the quality of care given a patient is not evidence that the surgeon has the right to control the manner in which all those involved in rendering care to the patient do their jobs; and it was established through plaintiff's own experts that nurse anesthetists are highly trained and skilled. While it is reasonable that the surgeon would have a supervisory obligation, there is no evidence that the surgeon would have the right to control the manner in which the anesthetist administered the anesthesia or performed the related functions of his job.

**Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 287-289.**

**Liability of operating surgeon for negligence of nurse assisting him. 12 ALR3d 1017.**

3. **Physicians, Surgeons, and Allied Professions § 11 (NCI3d) — negligence of nurse anesthetist — liability of surgeon — apparent agency**

A directed verdict was properly granted for a surgeon on the issue of apparent agency in a malpractice action in which it was undisputed that the nurse anesthetist was negligent. The consent form relied on by plaintiff was the hospital's consent form, not the surgeon's, it was witnessed by a hospital nurse and does not show that the surgeon personally made any representations to the patient, and the second sentence authorizing anesthetics is a separate authorization allowing another physician, not the surgeon or even an assistant selected by him, to administer the anesthesia. The consent form contains no evidence that the surgeon represented to the patient that he would employ or control the person administering the anesthesia.

HARRIS v. MILLER

[103 N.C. App. 312 (1991)]

Am Jur 2d, Physicians, Surgeons, and Other Healers § 182.

4. **Physicians, Surgeons, and Allied Professions § 15.2 (NCI3d)— negligence of nurse anesthetist—liability of surgeon—expert testimony—nurse anesthetist—excluded**

The trial court did not err in a medical malpractice action by excluding the expert testimony of a nurse anesthetist concerning the instructions and supervision a surgeon should give an anesthetist during a medical crisis where it was not disputed that the nurse anesthetist in this case was negligent, plaintiffs had settled with the nurse anesthetist and the hospital, and the action proceeded against the surgeon. The record does not reflect that plaintiff elicited from the witness that she was familiar with the standards of practice for orthopedic surgeons "with same or similar training and experience situated in the same or similar communities . . . ." N.C.G.S. § 90-21.12.

Am Jur 2d, Expert and Opinion Evidence § 396; Physicians, Surgeons, and Other Healers §§ 354, 356.

Medical malpractice: necessity and sufficiency of showing of medical witness' familiarity with particular medical or surgical technique involved in suit. 46 ALR3d 275.

Malpractice testimony: competency of physician or surgeon from one locality to testify, in malpractice case, as to standard of care required of defendant practicing in another locality. 37 ALR3d 420.

5. **Physicians, Surgeons, and Allied Professions § 15 (NCI3d)— medical malpractice deposition of expert—excluded—cumulative**

The trial court did not abuse its discretion in a medical malpractice action by excluding the deposition of an expert in orthopedic surgery where the evidence was cumulative.

Am Jur 2d, Evidence § 256.

Judge PHILLIPS dissenting.

APPEAL by writ of certiorari by plaintiff from judgment entered 5 January 1989 in MARTIN County Superior Court by *Judge William C. Griffin, Jr.* Heard in the Court of Appeals 28 November 1990.

*Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A., by Adam Stein and James E. Ferguson, II, for plaintiff-appellant.*

*LeBoeuf, Lamb, Leiby & MacRae, by George R. Ragsdale, Sherry C. McConnell, and Kurt E. Lindquist, II, for defendant-appellee.*

GREENE, Judge.

Etta Harris and her husband, Haywood Harris, filed this medical malpractice action on 1 April 1983 against George J. Miller, M.D. (an orthopedic surgeon), William Hawkes (a certified registered nurse anesthetist), and Beaufort County Hospital. On 21 October 1986, Mr. and Mrs. Harris settled with nurse Hawkes and Beaufort County Hospital and released them from liability.

On 8 November 1987, Mrs. Harris died from injuries sustained during her operation. Mr. Harris, as administrator of the estate of Etta Harris, was substituted as plaintiff and the complaint was amended to allege Mrs. Harris' wrongful death. Dr. Miller was the only defendant named in the amended complaint. The complaint alleges that Dr. Miller was negligent in treating Mrs. Harris, negligent in the supervision of nurse Hawkes, and vicariously liable for the negligence of nurse Hawkes in that Hawkes was Dr. Miller's agent.

Trial began on 28 November 1988. At the close of plaintiff's evidence, the trial court granted defendant's motion for a directed verdict on the issue of vicarious liability on the ground there was insufficient evidence of an agency relationship between Dr. Miller and nurse Hawkes and on the ground that the release of Hawkes relieved Dr. Miller of any vicarious liability. The jury returned a verdict in favor of defendant on the issue of defendant's own negligence. Plaintiff appeals.

Plaintiff's evidence tends to show that in 1981, Mrs. Harris experienced severe back pain and was referred by her physician to Dr. Miller. Dr. Miller diagnosed a ruptured disc requiring a laminectomy. On 26 May 1981, Mrs. Harris was admitted to Beaufort County Hospital and on 31 May 1981 she signed a consent form authorizing "Dr. Miller and/or such assistants as may be selected by him" to perform the operation.

Mrs. Harris underwent surgery on 1 June 1981. Dr. Miller performed the surgery and nurse anesthetist Hawkes administered

the anesthesia. At the time, Beaufort County Hospital did not employ a staff anesthesiologist. The hospital's Anesthesia Manual provided that "[a]nesthesia care shall be provided by nurse anesthetists working under the responsibility and supervision of the Surgeon doing the case." Nurse Hawkes was employed by the hospital as a certified registered nurse anesthetist. Dr. Miller, on the other hand, was in private practice and was not on the hospital staff. Nor was he in any way under contract with the hospital. He had applied for and obtained privileges to use the hospital facilities in the treatment of his patients.

Plaintiff introduced the testimony of an expert in anesthesiology who had reviewed Mrs. Harris' medical records and the depositions of Dr. Miller and nurse Hawkes. Based upon the anesthesia record maintained by nurse Hawkes throughout Mrs. Harris' operation, upon Hawkes' deposition, and upon his own expertise, the expert testified that after Mrs. Harris was put to sleep there was a small drop in her blood pressure. This drop is a normal reaction to the anesthetic agents used on patients. Generally, however, the blood pressure goes back up once the operation begins as a result of surgical stimulation. Mrs. Harris' blood pressure never went up.

At 8:05 a.m., approximately the time the surgery began, the blood pressure dropped lower and the heart rate rose to an abnormally high rate. Nurse Hawkes thought at the time these abnormalities resulted because Mrs. Harris was not deeply asleep. He increased the anesthetic. At 9:15 a.m., the blood pressure dropped lower. The anesthesia record indicates that by 9:30 a.m. the blood pressure had dropped so low it was no longer audible and the heart rate had risen higher. The expert testified that, based on the anesthesia record, Hawkes was continuing to give Mrs. Harris 33% oxygen, 66% nitrous oxide, and ½% ethrane. He further testified that in such a situation it was common knowledge that the proper measure is to cut off everything going to the patient except oxygen which is turned up to 100%, and that in his opinion Mrs. Harris suffered from brain damage due to hypoxia, or insufficient oxygenation, during the operation.

Plaintiff introduced the testimony of another expert in anesthesiology who had also reviewed the medical records and depositions. He testified that when nurse Hawkes became concerned that Mrs. Harris was not getting enough anesthesia he gave her a dose of innovar, a combination of a narcotic and tran-

quilizer which tends to decrease blood pressure. He testified that the low blood pressure and high heart rate which prompted Hawkes to give more anesthesia was not a result of insufficient anesthesia as Hawkes thought, but was a result of Hawkes' improper placement of the endotracheal tube. A post-operative x-ray revealed that the tube was ventilating only one lung. The expert stated his opinion that Mrs. Harris suffered brain damage between 9:15 and 10:30 a.m. due to prolonged low blood pressure and an improperly placed endotracheal tube.

Plaintiff read into evidence Dr. Miller's deposition which established that preparation for Mrs. Harris' surgery began at 7:30 a.m. on 1 June 1981. Dr. Miller began the operation at 8:05 a.m. At approximately 8:40 a.m., Dr. Miller noticed an unusual amount of bleeding which he began to control by direct pressure. Between 8:50 and 9:00 a.m., Dr. Miller noted the bleeding had not stopped as he would normally expect. At 9:00 a.m., when Mrs. Harris had lost three to four hundred cc's of blood, approximately twice the normal amount, Dr. Miller told nurse Hawkes to begin giving blood to Mrs. Harris. Dr. Miller stated he did not recall any response from Hawkes, though other evidence indicates that Hawkes responded that blood volume was "okay." After requesting blood, Dr. Miller returned to his attempts to control the bleeding and was unaware that blood was not started immediately. As a precautionary measure, two units of blood had been cross-matched to Mrs. Harris' blood before the operation began, and were in refrigeration in the hospital's blood bank on the floor above the operating room. Dr. Miller's post-operative review of the blood bank's records indicated the blood was not signed out of the blood bank until 9:30 a.m. Dr. Miller estimated that at the very earliest Mrs. Harris began receiving blood at 9:40 a.m., though nurse Hawkes did not designate in the records he kept during the operation the specific time blood was first given to Mrs. Harris. The blood bank records indicate the second unit was signed out at 9:43 a.m., and two additional units were cross-matched and signed out at 10:43 a.m. These two additional units of blood were cross-matched pursuant to a request made by Dr. Miller shortly after 10:00 a.m. By that time Dr. Miller had called in another surgeon, Dr. Waters, to assist him in controlling the bleeding problem. It was then that "we realized that we had a major bleeding problem."

Dr. Miller stated that he had no recollection of nurse Hawkes informing him at any time prior to 11:00 a.m. that Mrs. Harris'

blood pressure was dropping or that her heart rate was going up. Then, at approximately 11:10 a.m. both Dr. Miller and Dr. Waters were still operating on Mrs. Harris' back when nurse Hawkes informed them that Mrs. Harris' blood pressure and pulse had rapidly dropped to extremely low levels. The two surgeons then abandoned the efforts to control the bleeding and closed the incision in Mrs. Harris' back. Mrs. Harris was then transferred to another bed and placed on her back so the surgeons could begin resuscitation efforts.

Dr. Miller attributed the low pulse and blood pressure to massive unexplained and unaccounted bleeding. Thinking blood may have been entering the abdomen, Dr. Miller consulted with Dr. Coleman, a general surgeon with a sub-specialty in vascular surgery. Dr. Coleman used a needle to inspect the abdomen for blood and found none. Dr. Coleman then made an incision in the abdomen to examine for blood, again finding none.

Dr. Coleman examined the aorta and indicated that it was flaccid, that the heart was not pumping at a high volume. Dr. Coleman clamped the aorta so blood would not go to the legs, causing the blood pressure to increase. Dr. Coleman closed the incision after the blood pressure returned.

At approximately 1:30 p.m., Mrs. Harris was taken from the operating room to the intensive care unit. Mrs. Harris' condition was still unstable at that time, with a pulse of 110 and a systolic blood pressure of 40. Dr. Miller explained this move was made because the intensive care unit is better equipped for the long-term treatment and monitoring of a patient.

Plaintiff introduced the testimony of an expert in nurse anesthesia care. The trial court, however, would not allow this expert to testify that under the circumstances nurse Hawkes needed supervision in determining that a problem existed and in stabilizing Mrs. Harris' condition. Based on a *voir dire* examination, the expert would have also testified that it was Dr. Miller's responsibility to provide necessary supervision. During cross-examination of plaintiff's experts in anesthesiology, defendant elicited testimony regarding the training and competency of certified registered nurse anesthetists.

Q. Would you explain to the jury, please, what a certified registered nurse anesthetist is?

A. A certified registered nurse anesthetist is—has to first be an R.N. You have to be a registered nurse. Then have to have had certain experience. Just an ordinary nurse who works in a nursing home or on a surgical floor, for instance, does not qualify to go to anesthesia school.

In 1981—sorry—I keep going back to that. [The] nurse has to have certain experiences . . . primarily in the arena of critical care. They have to have had some experience in taking care of critically ill people before they are admitted to nursing anesthesia school.

The amount of nurse anesthesia school is two years continuous education and at the conclusion of which these student nurse anesthetist[s] are then given [an] examination and if they pass [it], then that certifies them to be a certified registered nurse anesthetist.

. . . .

Q. [W]ould it be fair to say that in North Carolina, probably most people who are put to sleep are directly put to sleep by a certified registered nurse anesthetist rather than by an anesthesiologist?

A. That's correct.

. . . .

Q. The quality of care rendered by a certified registered nurse anesthetist is high, is it not?

A. Generally.

Q. In fact, didn't you say in the jury's absence that you think that the standards of care for [an] anesthesiologist and a nurse anesthetist are exactly the same.

A. I do.

Q. And that's because their competency in terms of performing the actual tasks of anesthesia are comparable, are they not?

A. As a general rule, yes.

Q. There is no question in your mind, is there, doctor, that nurse anesthetists are experts in the delivery of anesthesia?

A. No doubt.

Regarding the issue of Dr. Miller's own negligence, the testimony relevant to this appeal pertained to Dr. Miller's attempts to control Mrs. Harris' bleeding during the operation. At one point in the operation Dr. Miller used a substance known as Surgicel to stop the bleeding. It was at this point that Dr. Miller called Dr. Waters into the operating room for assistance. After approximately twenty minutes, Dr. Miller removed the Surgicel thinking the bleeding should have stopped by that time. He found the bleeding had not stopped. Dr. Miller and Dr. Waters then consulted the product literature for Surgicel, provided by the manufacturer, and determined it should not be left in the patient upon completion of a laminectomy because it tends to swell upon contact with body fluids and could potentially put pressure on nerves and cause paralysis. Rather than replace the Surgicel, the surgeons attempted to temporarily control the bleeding by direct pressure while they looked for the sources of the blood.

Plaintiff offered during his case in chief the deposition of an expert in orthopedic surgery from Columbia, Missouri. This expert stated that there exists a generally recognized national standard of care for orthopedic surgeons. He further stated that Dr. Miller deviated from the applicable standard of care in his attempts to control Mrs. Harris' bleeding during the operation. Specifically, he contended the Surgicel substance should have been left in place to stop the bleeding, or at least once it was removed and Dr. Miller could see the bleeding had not stopped he should have replaced the Surgicel. The failure to replace the Surgicel made "a very bad situation into an irretrievable one," and caused hypovolemic shock which resulted in brain damage.

Defendant offered the testimony of an expert in orthopedic surgery who testified that he was familiar with the standard of care as it existed in June of 1981 for communities similar to Beaufort County. He further testified that Dr. Miller did not depart from the applicable standard of care, that Dr. Miller did everything orthopedic surgeons are taught to do to control bleeding, and that it was appropriate for Dr. Miller to remove the Surgicel when he did.

HARRIS v. MILLER

[103 N.C. App. 312 (1991)]

Plaintiff sought to introduce in rebuttal the deposition of another orthopedic surgeon who stated that he practices medicine in Wilson, North Carolina. He and Dr. Miller both belong to the Eastern North Carolina Orthopedic Association which consists of approximately thirty-four orthopedic surgeons from a number of towns in eastern North Carolina. After initially stating that he does not generally use Surgicel in back operations because of potential complications, he stated in pertinent part:

Q All right, and it was the duty of the surgeon to contain the bleeding?

A That is correct.

Q All right, it would be a departure from the standard of care for the surgeon not to bring this bleeding under control and end the procedure, isn't that correct?

A That is correct.

Q Even if it required the use of Surgicel to do that, it should be done, isn't that correct, Doctor?

A I think that Surgicel was probably the only thing that was stopping the bleeding. And if—at this point probably Surgicel would be used.

Q Even though there may be certain risks that Surgicel may have on nerve roots, when you balance that against what can happen with the blood loss, it would be better to leave the Surgicel in, isn't that correct, Doctor?

A I—I think so.

The trial court excluded this testimony upon concluding it was similar to other evidence offered during plaintiff's case in chief on the issue of whether Dr. Miller breached the applicable standard of care and was not, therefore, rebuttal evidence.

---

The dispositive issues are: (I) whether the trial court erred in granting a directed verdict for defendant at the close of plaintiff's evidence in that plaintiff presented sufficient evidence of an agency relationship between Dr. Miller and nurse Hawkes to submit to the jury the issue of Dr. Miller's vicarious liability based on the doctrine of *respondeat superior*; (II) whether in the absence of an agency relationship, there was sufficient evidence of apparent

agency to submit the issue of vicarious liability to the jury; (III) whether the trial court erred in excluding portions of the testimony of plaintiff's expert in nurse anesthetist care; and (IV) whether the trial court erred in excluding the deposition testimony of an orthopedic surgeon offered by plaintiff as rebuttal evidence.

I

[1] Plaintiff first argues the trial court erred in directing a verdict in defendant's favor, at the close of plaintiff's evidence, on the issue of Dr. Miller's vicarious liability.

A defendant's motion for a directed verdict is a test of whether the evidence is legally sufficient to submit the case to the jury and to support a verdict for plaintiff. *Shreve v. Duke Power Co.*, 97 N.C. App. 648, 649, 389 S.E.2d 444, 445, *disc. rev. denied*, 326 N.C. 598, 393 S.E.2d 883 (1990). In deciding a motion for a directed verdict, the trial court must consider the evidence in the light most favorable to the nonmoving party. *Watkins v. Hellings*, 321 N.C. 78, 361 S.E.2d 568 (1987). A directed verdict may be granted only if, as a matter of law, the evidence is insufficient to justify a verdict for the nonmovant. *Id.* In the present case we determine whether the evidence, considered in a light most favorable to plaintiff, was sufficient to submit to the jury the issue of vicarious liability.

The doctrine of *respondeat superior* provides that the employer is liable for the negligence of his employee occurring while the employee is acting within the scope of his employment. *Thomas v. Poole*, 45 N.C. App. 260, 264, 262 S.E.2d 854, 856 (1980). Liability based on the doctrine of *respondeat superior* is established by proving the following facts: "(1) an injury by the negligence of the wrongdoer, (2) the relationship of employer-employee between the party to be charged and the wrongdoer, (3) a wrong perpetrated in the course of employment or within the employee's scope of authority, and (4) an employee going about the business of his superior at the time of the injury." *White v. Hardy*, 678 F.2d 485, 487 (4th cir. 1982).

It is undisputed in this case that nurse Hawkes was employed by Beaufort County Hospital, and that he negligently caused injury to Mrs. Harris while acting in the course and scope of his employment. Plaintiff argues further, however, that nurse Hawkes was a "lent servant" acting under the immediate control, power and

HARRIS v. MILLER

[103 N.C. App. 312 (1991)]

supervision of Dr. Miller and that there was, therefore, a relation-
ship of employer-employee between Dr. Miller and nurse Hawkes.

We reject any argument that an operating surgeon is the so-
called "captain of the ship" such that all personnel in the operating
room are unquestionably deemed to be the surgeon's employees.
Note, *Texas Labels Captain of the Ship Doctrine: "False Rule
of Agency*," 14 Wake L. Rev. 319 (1978) (explaining and criticizing
captain of the ship doctrine). The "vital test" of whether the surgeon
is an employer of those in the operating room is whether the
surgeon has the right to control the operating room personnel.
*Hayes v. Elon College*, 224 N.C. 11, 15, 29 S.E.2d 137, 139-40 (1944)
(setting forth eight factors which are, among others, useful in deter-
mining whether a right of control exists). Regarding the employer-
employee relationship in the context of lent servants, our Supreme
Court has quoted with approval the language used by the Supreme
Court of Pennsylvania.

"1. One who is in the general employ of another may,
with respect to certain work, be transferred to the service
of a third person in such a way that he becomes, for the
time being and in the particular service which he is engaged
to perform, an employe of that person. (citations)

"2. The crucial test in determining whether a servant
furnished by one person to another becomes the employe of
the person to whom he is loaned is whether he passes under
the latter's right of control with regard not only to the work
to be done *but also to the manner of performing it.* (citations)

"3. A servant is the employe of the person who has the
*right* of controlling the manner of his performance of the work,
irrespective of whether he actually *exercises* that control or
not. (citations)

. . . ."

*Weaver v. Bennet*, 259 N.C. 16, 28, 129 S.E.2d 610, 618 (1963)
(quoting *Mature v. Angelo*, 373 Pa. 593, 97 A.2d 59 (1953)). The
question before us thus becomes whether plaintiff presented suffi-
cient evidence that Dr. Miller possessed the right to control the
work done by nurse Hawkes and also the manner in which nurse
Hawkes performed his work.

[2]   Plaintiff first contends such evidence was offered in the form of the hospital's policy manual which provides that "a nurse anesthetist [works] under the responsibility and supervision of the surgeon doing the case." Plaintiff argues that the case of *Jackson v. Joyner*, 236 N.C. 259, 72 S.E.2d 589 (1952), stands for the proposition that a nurse anesthetist employed by a hospital becomes the lent servant of the surgeon for the duration of the operation if the surgeon has the immediate power to supervise and control the nurse. In *Jackson*, an eight-year-old girl died after a tonsillectomy due to anesthesia complications. The girl's mother had requested that her family physician be engaged to administer the anesthesia for the operation. The surgeon rejected the request, stating he had someone to administer the anesthetic, a nurse Hanson, and that he would use that person. *Jackson* at 261, 72 S.E.2d at 591. *See Jackson v. Sanitarium*, 234 N.C. 222, 67 S.E.2d 57 (1951) (an earlier appeal of the same case). The surgeon then arranged for the assistance of nurse Hanson who was employed by the hospital. In line with the principles stated above, the Supreme Court held that the trial court erred in removing from the jury an issue of *respondeat superior* because, under these circumstances, the surgeon had full power of control over nurse Hanson and that nurse Hanson was therefore a lent servant. *Jackson* at 261, 72 S.E.2d at 591.

The evidence relied upon by plaintiff in the present case, i.e., the hospital policy manual, gives the surgeon the power to *supervise* the nurse anesthetist during the operation. However, there is a distinction between the power to supervise and the power to control.

> [A] servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out to the servant the work to be done, *or supervises the performance thereof*, or designates the place and time for such performance, or gives the servant signals calling him into activity, or gives him directions as to the details of the work and the manner of doing it . . . .

*Weaver* at 25, 129 S.E.2d at 616 (emphasis added) (citations omitted). *See also* 57 C.J.S. *Master and Servant* § 566 (1948). Therefore, it is not sufficient that the surgeon has the power to *supervise*, or even that he has the power to give directions as to the details and manner of doing the work. There must be evidence that the surgeon has the right to *control* the work and the manner of doing

it. *Weaver*. The hospital policy manual standing alone does not constitute evidence of such control.

We also find *Jackson* factually distinguishable. Plaintiff in the present case offered no evidence that Dr. Miller personally selected nurse Hawkes as the anesthetist. In *Jackson*, the surgeon personally selected the anesthetist, rejecting the request of the patient's mother that her family physician administer the anesthesia. It is generally stated that inherent to the right to control is the right to select, and accordingly discharge, the alleged employee. 57 C.J.S. *Master and Servant* § 563(b) (1948) ("it is indispensable that the right to select the person claimed to be a servant should exist").

This case is more analogous to the later case of *Starnes v. Hospital Authority*, 28 N.C. App. 418, 221 S.E.2d 733 (1976). In *Starnes*, plaintiff argued that a surgeon was vicariously liable for the negligence of a nurse anesthetist who caused burns to an infant during an operation. This Court rejected the argument where the record disclosed that the anesthetist was assigned by the hospital's anesthesiology department and the surgeon had no responsibility for the training or assignment of nurse anesthetists. Similarly, in this case there was no evidence that Dr. Miller had any responsibility for the assignment or training of nurse anesthetists.

Plaintiff next argues that Mrs. Harris consented to surgery by "Dr. Miller and/or the assistants as may be selected by him," and that this consent confirms that Dr. Miller had control over nurse Hawkes during the operation. We reject this argument. The consent form does not constitute evidence that Dr. Miller had the right to control the work and the manner of performing the work of nurse Hawkes.

Finally, plaintiff argues that six witnesses, including Dr. Miller himself, testified that the surgeon has the ultimate responsibility for the quality of care given a patient. It is unclear whether this "ultimate responsibility" results from a medical code of ethics, a hospital disciplinary code, or some other policy within the medical profession. In any event, we are unpersuaded that this conclusory testimony should be accepted as a competent legal conclusion on the part of the medical profession that a surgeon is vicariously liable for any and all negligence which occurs in the course of care given a patient. The fact that under some statement of policy a surgeon bears the "ultimate responsibility" of care is not evidence

that the surgeon has the right to control the manner in which all those involved in rendering care to the patient do their jobs.

Furthermore, it was established through plaintiff's own experts in this case that nurse anesthetists are highly trained and highly skilled. There was testimony that the standard of care for a nurse anesthetist is the same as that for an anesthesiologist, and that nurse anesthetists are experts in the delivery of anesthesia. This evidence is indicative that the surgeon and anesthetist work as a team, each with his own area of expertise, to achieve as a common end the successful completion of the surgery. It is reasonable that the surgeon would have a supervisory obligation to effect that end, but, at least in this case, there is no evidence that the surgeon had the right to control the manner in which the anesthetist administered the anesthesia or performed the related functions of his job as set out by hospital policy.

Therefore, nurse Hawkes was not, on this evidence, Dr. Miller's employee under the doctrine of *respondeat superior*.

II

[3] Plaintiff next argues that in the absence of an employer-employee relationship, Dr. Miller is vicariously liable under the principle of apparent agency in that he held out to Mrs. Harris, via the consent form, that he had the right to control nurse Hawkes during the course of the surgery. Plaintiff correctly states that a principal who represents to a third party that another is his agent is liable for harm caused the third party by the apparent agent if the third party justifiably relied upon the principal's representation. *See* Restatement (second) of Agency § 267 (1958). However, we reject plaintiff's argument for two reasons.

First, the consent form referred to by plaintiff purports to be Beaufort County Hospital's consent form, not Dr. Miller's consent form. The form is signed by Mrs. Harris and witnessed by a hospital nurse. The form itself does not show that Dr. Miller personally made any representations to Mrs. Harris.

Second, the consent form is entitled "SPECIAL CONSENT TO OPERATION, ANESTHESIA OR OTHER PROCEDURE." The form first authorizes Dr. Miller to perform the operation. In pertinent part, the form goes on to provide:

## HARRIS v. MILLER

[103 N.C. App. 312 (1991)]

I further authorize and request that the above-named physician and/or his assistants perform such procedures as are, in his professional judgment, necessary and desirable. I consent to the administration of such anesthetics as may be considered necessary or advisable by the physician responsible for this service.

By the language of the consent form, Mrs. Harris authorized the "above-named physician," i.e., Dr. Miller, to perform such other procedures as he deemed necessary. The second sentence above represents a second, independent consent to the administration of anesthetics "by the physician responsible for this service." This consent is a separate authorization allowing another physician, not Dr. Miller nor even an assistant selected by him, to administer the anesthesia. Thus, the consent form contains no evidence that Dr. Miller represented to Mrs. Harris that he would employ or control the one administering the anesthesia.

Accordingly, nurse Hawkes was not, on this evidence, Dr. Miller's apparent agent, and directed verdict on this issue was not error.

### III

[4] Plaintiff next argues the trial court erred by excluding the expert testimony of a nurse anesthetist. Had the nurse been allowed to testify she would have testified to the instructions and supervision a surgeon should give an anesthetist during a medical crisis.

We agree with plaintiff that a witness may be deemed an expert for purposes of giving opinion testimony in fields other than his or her own area of a profession. *White v. Hunsinger*, 88 N.C. App. 382, 363 S.E.2d 203 (1988) (obstetrician-gynecologist competent to testify as to referral practices of pediatrician); *Lowery v. Newton*, 52 N.C. App. 234, 278 S.E.2d 566, *disc. rev. denied*, 303 N.C. 711 (1981) (general/plastic surgeon competent to testify to standard of care of neurosurgeon); *Haney v. Alexander*, 71 N.C. App. 731, 323 S.E.2d 430 (1984), *cert. denied*, 313 N.C. 329, 327 S.E.2d 889 (1985) (physicians competent to testify to standard of care for nurses). Accordingly, situations may exist where a nurse is competent to testify to the standard of care for a physician. However, the applicable statute provides:

HARRIS v. MILLER

[103 N.C. App. 312 (1991)]

In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

N.C.G.S. § 90-21.12 (1990).

In the present case, the witness testified that she was "familiar with the standards of care relating to anesthesia practice for certified registered nurse anesthetists in North Carolina." She was accepted by the trial court as an expert in nurse anesthetist care. However, the record does not reflect that plaintiff elicited from this witness that she was familiar with the standards of practice for orthopedic surgeons "with same or similar training and experience situated in the same or similar communities . . . ." *Id.* Therefore, the exclusion of the anesthetist expert's testimony regarding any action or directions or supervision a surgeon should give during a medical crisis is not error. *See York v. Northern Hospital District*, 88 N.C. App. 183, 362 S.E.2d 859 (1987), *disc. rev. denied*, 322 N.C. 116, 367 S.E.2d 922 (1988) (no error in excluding nurse's testimony as to the standard of care required of a surgeon or anesthesiologist where there was no foundation that nurse was familiar with those standards).

IV

[5] Plaintiff's final argument is that the trial court erred in excluding as rebuttal evidence the deposition of an expert in orthopedic surgery stating that he practiced in eastern North Carolina and that Dr. Miller deviated from the standard practices of orthopedic surgeons in eastern North Carolina and communities similar to Beaufort County. The trial court excluded the evidence upon concluding it was similar to other evidence offered during plaintiff's case in chief on the issue of whether Dr. Miller breached the applicable standard of care and was not, therefore, rebuttal evidence.

**HARRIS v. MILLER**

[103 N.C. App. 312 (1991)]

The general rule is that it is in the discretion of the trial judge whether to allow additional evidence by a party after that party has rested or whether to allow additional evidence after the close of the evidence. *Castle v. B. H. Yates Co.*, 18 N.C. App. 632, 634, 197 S.E.2d 611, 613 (1973). Rebuttal is not generally intended as an opportunity for plaintiff to present his case again. "[T]he usual rule will exclude *all evidence which has not been made necessary by the opponent's case in reply.*" Wigmore, *Wigmore on Evidence* § 1873 (1976). Thus, plaintiff's case in rebuttal does not consist of witnesses who merely support his complaint, "but is confined to testimony which is directed to refuting the evidence of the defendant, unless the court in its discretion permits him to depart from the regular order of proof." McCormick, *McCormick on Evidence* § 4 (3d ed. 1984).

N.C.G.S. § 90-21.12 establishes a method for ascertaining the standard of care which is to be determined in accordance with "the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities. . . ." The standard of care may vary from community to community depending upon the practices of health care providers in that community. Conflicts in the evidence as to the standard of care for a particular community are resolved by the jury.

On the question of the applicable standard of care, plaintiff in his case in chief presented the deposition testimony of Dr. Gaines, an orthopedic surgeon who was not directly familiar with the standard of practice in Beaufort County. However, he was no less competent to testify as to the applicable standard of practice because of his foundation testimony that in his opinion there is a national standard of practice for orthopedic surgeons and that he was familiar with the national standard. *See Haney v. Alexander*, 71 N.C. App. 731, 736, 323 S.E.2d 430, 434 (1984) (where standard is same across the country, expert familiar with standard may testify despite no familiarity with defendant's community). Plaintiff's witness was, in effect, familiar with the standard of practice in Beaufort County and similar counties because he was familiar with the national standard of practice. Dr. Gaines' deposition proceeds to assert that Dr. Miller deviated from the standard of practice in several ways, the most specific of which was Dr. Miller's decision to remove the Surgicel used to control bleeding during the operation.

Defendant presented the testimony of Dr. Hamilton, an orthopedic surgeon who established as a foundation for his testimony that he was familiar with the standard of practice in Beaufort County and similar communities. He stated that Dr. Miller did not deviate from standard of practice, and particularly, that Dr. Miller acted appropriately by removing the Surgicel.

Plaintiff's proposed rebuttal was a deposition of another orthopedic surgeon who practices in a community near Beaufort County and who laid a foundation for his testimony by establishing, at least inferentially, that he was familiar with the standard practices of orthopedic surgeons in communities similar to Beaufort County. The deposition states that Dr. Miller deviated from standard practice by removing the Surgicel.

The only significant difference between the deposition offered during plaintiff's case in chief and the deposition plaintiff sought to introduce as rebuttal is the foundation evidence which enables each surgeon to testify under N.C.G.S. § 90-21.12, i.e., that he is familiar with the standard practices for orthopedic surgeons in the same or similar communities. The substantive evidence, i.e., what the standard practice is in such communities, is the same in both depositions. We therefore find no abuse of discretion in the trial court's exclusion of this evidence on the basis that it is cumulative to the evidence offered by plaintiff in his case in chief and is not rebuttal.

No error.

Judge ORR concurs.

Judge PHILLIPS dissents with separate opinion.

Judge PHILLIPS dissenting.

In my opinion the trial court erred in directing a verdict for the defendant on the agency issue, as the evidence presented was sufficient to indicate that Dr. Miller had the right to control the work of Nurse Hawkes during the operation and the manner in which he did it. In brushing aside the testimony of several doctors, including Dr. Miller himself, that defendant had the ultimate responsibility for the proper treatment of the patient during surgery, the majority incorrectly indicates that the testimony was without

legal or probative effect and that the source of that responsibility is unclear and may result from some ineffective medical or hospital code. As the evidence plainly indicates, it seems to me, the surgeon's ultimate responsibility for those who assist in the surgery results from the physician-patient relationship, the nature of the services undertaken, and the realities of the operating room, where the only alternative to a coordinated team effort under the control of the surgeon is for the assistants to do as they see fit, which is a folly that no sensible patient not *in extremis* would ever knowingly submit to and that no conscientious surgeon would ever permit.

And in my view it was prejudicial error to exclude the expert testimony of Nurse Anesthetist Privatte as to the things that a nurse anesthetist can and cannot properly do during a medical crisis without instructions from the surgeon and as to the instructions that surgeons give in such situations. Though not a surgeon, she had assisted surgeons in thousands of operations and was eminently qualified to give the testimony, which could have made a difference in the case, and what members of a trade or profession ordinarily do in certain situations is evidence of what should be done in those situations, though not phrased in the jargon of approved standards.