CHAD LAIL, BY AND THROUGH HIS GUARDIANS AD LITEM, TERESA P. LAIL, AND TIMOTHY
D. LAIL, PLAINTIFFS v. BOWMAN GRAY SCHOOL OF MEDICINE AND NORTH
CAROLINA BAPTIST HOSPITAL, INC., DEFENDANTS

No. COA08-811

(Filed 21 April 2009)

**1. Medical Malpractice— mentioning prior suit and settlement—curative instruction—invited error—waiver**

The trial court did not err in a medical malpractice case by
allowing the introduction of evidence regarding plaintiffs' prior
suit and settlement against Grace Hospital because: (1) plaintiffs
failed to point to any portion of the transcript which referred to
the Grace Hospital litigation other than the trial court's curative
instruction; (2) if plaintiffs' exception was to the response to its
own questions, a party may not assert error based on a course he
himself pursued at trial; and (3) if plaintiffs excepted to some
other evidence of the Grace Hospital litigation admitted at trial,
the assignment of error is dismissed since the scope of review on
appeal is confined to a consideration of those assignments of
error set out in the record on appeal in accordance with N.C. R.
App. P. 10(a).

**2. Discovery— motion in limine—failure to state standard of review—failure to object—waiver**

The trial court did not commit reversible error in a medical
malpractice case by its pre-trial exclusion of the prior discovery
deposition of a doctor because plaintiffs waived review of this
issue by failing to call the doctor to testify at trial. N.C. R. App. P.
10(b)(1).

**3. Medical Malpractice— surprise causation opinions contrary to written diagnosis and treatment records—failure to designate expert witness—treating physician exception**

The trial court did not commit reversible error in a medical
malpractice case by allowing a defense witness doctor to offer
"surprise causation" opinions contrary to the written diagnosis
and treatment records contained in the hospital records of
defendant hospital even though plaintiffs contend the witness
was never properly designated as an expert witness because: (1)
even though plaintiffs' restatement of and agreement with the
trial court's ruling that the witness was a treating physician was
not invited error, plaintiffs' counsel's comments did waive appellate review of the witness's testimony insofar as it arose from his

role as treating physician; (2) plaintiff failed to include a standard of review in his brief as required by N.C. R. App. P. 28(b)(6), and the admission or exclusion of opinion testimony, whether from a fact witness or an expert witness, is reviewed only for abuse of discretion; (3) the witness was excluded from mandatory designation as an expert witness since the treating physician exception is a bright line exception, and none of the pertinent testimony, including his testimony about why discharge summaries sometimes contain errors and omissions, fell outside the witness's role as treating physician; and (4) the witness was included in a class of persons named in defendants' designation of expert witnesses even if he was not specifically named.

**4. Medical Malpractice— rebuttal witness—factual testimony of treating physician**

The trial court did not abuse its discretion in a medical malpractice case by excluding the rebuttal testimony of a doctor that was proffered by plaintiffs to rebut the testimony of a defense witness doctor because: ·(1) the defense witness's testimony as to the erroneous discharge summary was not expert opinion testimony regarding causation that necessitated expert rebuttal since it was simply factual testimony by a treating physician about the minor child's diagnosis, the method of preparation of the medical records, and why the doctor considered that the records contained serious omissions; (2) the trial had already lasted nearly three weeks when plaintiffs proffered the doctor as a rebuttal witness, and the jury had already heard the doctor's extensive prior testimony regarding his certainty as to the accuracy of the medical records; (3) the transcript showed that the trial court carefully considered each part of the testimony of plaintiffs' doctor and excluded his testimony about accuracy of the medical records as needlessly cumulative and time-wasting, but allowed testimony regarding defendant doctor's diagrams which it considered new evidence in the case; and (4) neither the substance of the rebuttal evidence, nor the procedure where the trial court considered this evidence outside the presence of the jury, suggested that the trial court made an arbitrary or unreasonable decision.

**5. Medical Malpractice— standard of care—motion to strike testimony**

The trial court did not err in a medical malpractice case by failing to strike the testimony of a doctor who allegedly applied

the incorrect standard of care to another doctor's treatment of the minor child because: (1) plaintiffs pointed to no portion of the doctor's testimony on direct examination, and none was found, where he defined the standard of care he was using; (2) the record reflected that plaintiffs' counsel's question was directed only to the doctor's testimony in his deposition and not at trial; and (3) although it was proper for plaintiffs to point out the discrepancy between the doctor's deposition testimony and his trial testimony for purposes of impeachment, the record did not support plaintiffs' argument for a motion to strike when the doctor was never asked and never expressed the standard of care.

**6. Trials— motion for new trial—failure to make substantive argument**

The trial court did not err in a medical malpractice case by denying plaintiffs' motion for a new trial because: (1) plaintiffs made no substantive argument regarding any legal basis for a new trial, and their motion for a new trial referred generally to the same issues previously considered; and (2) no error was found in the trial court's ruling on the issues presented for appeal.

Appeal by plaintiffs from judgment entered 24 September 2007 by Judge Anderson D. Cromer in Catawba County Superior Court. Heard in the Court of Appeals 11 December 2008.

*W. Wallace Respess, Jr. and W. Russ Johnson, III, for plaintiff-appellant.*

*Wilson & Coffey, LLP, by Tamura D. Coffey, Kevin B. Cartledge and Lorin J. Lapidus, for defendant-appellee.*

STROUD, Judge.

This appeal arises from a medical malpractice action. Plaintiffs appeal from a judgment of dismissal, entered upon the jury's verdict that the minor child, Chad Lail, was not injured by the negligence of defendants. On appeal, plaintiffs argue that they are entitled to a new trial because of five errors made by the trial court in the admission of evidence. For the following reasons, we find no error and affirm the judgment of the trial court.

## I. Background

On 17 January 1991, plaintiff Teresa Lail ("Teresa") was admitted to Grace Hospital in Morganton, Burke County with pre-term labor.

Teresa was treated by Dr. Robert Lundquist to retard labor. On 18 January 1991, she was transferred to Forsyth Memorial Hospital in Winston-Salem, where she gave birth to plaintiff Chad Lail ("Chad") at 12:30 p.m. on 20 January 1991. Although Chad was born at approximately 30 weeks gestation and weighed about 3 lbs. 13 oz., his Apgar scores were good. Chad also was "vigorous, with good cry" at birth.

At the time of Chad's birth, Dr. David Berry ("Dr. Berry") was an assistant professor of medicine at Bowman Gray School of Medicine. Dr. Berry was the attending physician of record for Chad on the day of his birth, although he did not personally see Chad on that date. Dr. Berry was supervising Dr. Martha Simpson ("Dr. Simpson"), a third year neonatology resident who actually treated Chad at Forsyth Memorial Hospital.

Within the first few hours of Chad's life, his condition began to deteriorate and he developed respiratory distress. Dr. Simpson had ordered his intubation and began administration of antibiotics. However, "[t]ransfer to the NCBH [North Carolina Baptist Hospital] Intensive Care Nursery was arranged with Dr. Berry[,]" for ventilatory support soon thereafter. Chad's admission note to NCBH "[r]uled out sepsis." The admission note named Dr. Robert Dillard as "Attending Physician, Pediatrics[,]" but was signed by Dr. Michael O'Shea.

At NCBH, Chad was treated with oxygen, dopamine, dobutamine, antibiotics and other medicines. NCBH discharged Chad on 1 March 1991. Chad's NCBH discharge summary named Dr. Berry as "Attending Physician, Pediatrics," but the discharge summary was signed by Dr. Michael O'Shea. The Admission Diagnosis on the discharge summary listed "Prematurity" and "Respiratory distress syndrome" ("RDS"). The discharge summary further noted that "[u]pon admission, cultures revealed E. Coli sepsis" and that Chad's problems included RDS and "E. Coli sepsis and meningitis with pos[illegible] post-infectious leading to hydrocephalus."

Plaintiffs filed suit (02 CVS 2507) against Dr. Lundquist and Grace Hospital, Inc. ("the Grace Hospital litigation") seeking damages for the treatment received by Teresa. On 11 November 2004 Dr. Berry was deposed in connection with the Grace Hospital litigation by Phillip Jackson, attorney for Grace Hospital, Inc. The deposition was recorded on video.

On or about 30 March 2005, plaintiffs filed a complaint (02 CVS 981) against Martha K. Simpson, M.D., individually; Novant Health, Inc. d/b/a Forsyth Medical Center; Forsyth Memorial Hospital, Inc.;

Forsyth Medical Center; Wake Forest University North Carolina Baptist Hospital; Wake Forest University Baptist Medical Center; Wake Forest University Health Sciences; and David Berry, M.D., individually. The complaint alleged that Chad Lail developed cerebral palsy as a result of defendants' negligence and sought damages for personal injury, pain and suffering, economic loss and medical expenses. Plaintiffs' complaint alleged that shortly after his birth, Chad developed an E. coli infection which spread to his cerebrospinal fluid and ultimately caused meningitis, cerebral palsy, and brain damage. Plaintiffs alleged that defendants were negligent in their failure to recognize and respond promptly to various sepsis risk factors and that the delay in treatment of the E. Coli infection caused Chad's injuries and permanent disability.

Defendant Dr. Berry filed an answer on 5 July 2005 denying negligence. The other defendants filed an answer on 11 July 2005 denying that Chad's treatment fell below the applicable standard of care.

On or about 15 April 2005, Grace Hospital, Inc., moved to consolidate for trial the Grace Hospital litigation with this action. Grace Hospital's motion to consolidate was denied by the trial court on or about 1 August 2005. The Grace Hospital litigation ultimately settled.[1]

On or about 14 November 2005 Dr. Berry moved to exclude his 11 November 2004 deposition in the Grace Hospital litigation from use in the case *sub judice*, on the grounds that "it was obtained and influenced as a result of improper communications by Plaintiffs' counsel." This motion was denied by Judge Timothy S. Kincaid on 3 February 2006.

On 21 November 2006, plaintiffs voluntary dismissed with prejudice Martha K. Simpson, M.D., individually; Novant Health, Inc. d/b/a Forsyth Medical Center; Forsyth Memorial Hospital, Inc.; Forsyth Medical Center; Wake Forest University Baptist Medical Center; and David Berry, M.D., individually. The parties agreed to substitute North Carolina Baptist Hospital, Inc. and Bowman Gray School of Medicine as defendants.

The case was tried before a jury in Superior Court, Catawba County from 16 August 2007 to 10 September 2007, Judge Anderson D. Cromer presiding. The jury found that Chad Lail was not injured by the negligence of defendants. The trial court entered judgment pur-

---

1. Our search of the record did not reveal, and neither party mentioned, the date the Grace Hospital litigation was filed or resolved.

suant to the jury verdict, dismissing plaintiffs' claims with prejudice and taxing costs against plaintiffs. Plaintiffs filed a motion for new trial on or about 26 September 2007. The motion for new trial was denied on 13 December 2007. Plaintiffs appeal from both the judgment entered pursuant to the jury verdict and the denial of the motion for new trial.

## II. Evidence Regarding the Grace Hospital Litigation

[1] Plaintiffs argue that the trial court erred by allowing the introduction of evidence regarding the plaintiffs' prior suit and settlement against Grace Hospital and that this error was not cured by the trial Court's subsequent instructions to the jury to disregard this evidence. Plaintiffs argue that "defendant's counsel was allowed over numerous pretrial objections to offer evidence of a prior settlement with Grace Hospital arising out of their failure to provide correct medication to [Teresa Lail] to delay the onset of premature labor." Defendants argue that plaintiffs invited the purported error by introducing evidence of the Grace Hospital litigation and settlement.

Although plaintiffs argue that they made "numerous pretrial objections" to introduction of evidence regarding the Grace Hospital litigation, their brief fails to direct us in the record or transcript to any such objection, and their assignments of error direct us only to the entire transcript section containing the motion *in limine* argument before the trial judge. The record contains no written motion *in limine* filed by plaintiffs, although the pretrial order notes that both parties would have motions *in limine* to be heard prior to trial. Thus, it appears that plaintiffs are referring to their motion "to exclude references to the prior lawsuit and the prior settlement [based upon the fact that] its relevance, the probative value, if any, is outweighed substantially by the danger of unfair prejudice." The motion was based on the grounds that evidence of the Grace Hospital litigation would influence the jury to decide that Grace Hospital, not defendants, were responsible for Chad's injuries.

After extensive argument, the trial court ruled that

in light of everything involved in this case, the Court has weighed the relevance and materiality of the [Grace Hospital litigation] and the Court has further weighed its probative value versus its prejudicial effect under Rule 403, and balancing test, the Court has concluded that the fact that Grace litigation was instituted may be admitted and further that a settlement was reached. . . .

[T]he Court is inclined to prevent any other information concerning the litigation or the settlement from being offered to the jury. . . . The doors may be open[ed] for those types of things but I'll be here, as the gatekeeper, to determine whether they have; but if you think the door has been [opened], then you best check with me before you ask a question about it.

The next day, the trial court mentioned the Grace Hospital litigation again:

THE COURT: Everybody understand the Court's ruling yesterday on the settlement agreement and the previous lawsuit?

[PLAINTIFFS' COUNSEL]: Plaintiff understands and I'm going to ask two questions. Did you sue Grace? Did you settle? Yes. Yes.

THE COURT: Yes sir, I understand. I just wanted to make sure everybody—if they had any additional thoughts overnight after they heard my ruling yesterday. If they wanted to be heard any more.

[DEFENDANTS' COUNSEL]: No, sir.

[PLAINTIFFS' COUNSEL]: Not from plaintiff.

Plaintiffs have not assigned error to or directed our attention to any specific evidence admitted during the trial regarding the Grace Hospital litigation to which plaintiffs objected. However, in reading through the transcript we find that on direct examination of Teresa, *plaintiffs' counsel* asked the following:

Q. Incidentally, the—was there a prior lawsuit brought on behalf of Chad against the Grace Hospital folks?

A. Yes.

Q. And was that settled?

A. Yes

On cross-examination defendants' counsel asked nearly identical questions and received the same answers. Plaintiffs have not pointed us to any other portion of the transcript which referred to the Grace Hospital litigation, other than the trial court's curative instruction.

If plaintiffs' exception is to the response to its own questions quoted above, it is well settled that "a party may not assert error based on a course he himself pursued at trial." *Crump v. Bd. of*

*Education,* 93 N.C. App. 168, 188, 378 S.E.2d 32, 44 (1989), *modified on other grounds and aff'd,* 326 N.C. 603, 392 S.E.2d 579 (1990). Furthermore,

> our system of justice is based upon the assumption that trial jurors are women and men of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so. Thus, any error was corrected by the trial court's prompt curative instructions.

*State v. Hartman,* 344 N.C. 445, 472, 476 S.E.2d 328, 343 (1996) (citations and quotation marks omitted), *cert. denied,* 520 U.S. 1201, 137 L. Ed. 2d 708 (1997).

On the other hand, if plaintiffs excepted to some other evidence of the Grace Hospital litigation admitted at trial, the assignment of error is dismissed because "the scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal in accordance with this Rule 10." N.C.R. App. P. 10(a). According to Rule 10, "[a]n assignment of error is [not] sufficient [unless] it directs the attention of the appellate court to the particular error about which the question is made, with *clear and specific record or transcript references.*" N.C.R. App. P. 10(c)(1) (emphasis added).

### III. Dr. Berry's Deposition Testimony

[2] Plaintiffs argue that the trial court committed reversible error by its exclusion of the prior discovery deposition of David Berry, M.D. because the deposition was previously ordered admitted into evidence by another Superior Court judge and there was not a sufficient showing by defendants of a substantial change in circumstances warranting a different or new disposition of the matter. Defendants argue that plaintiffs waived appellate review of this issue because "plaintiff never called Dr. Berry to testify—[plaintiff] simply chose not to do so despite ample opportunity throughout trial."

We first note that plaintiffs have failed to state any standard of review for this issue as required by Rule 28(b)(6). "Though we could impose a monetary penalty for this oversight, we elect instead to admonish [plaintiffs'] counsel to exercise care when preparing briefs submitted to this Court." *Devaney v. Miller,* 191 N.C. App. 208, 211, 662 S.E.2d 672, 675 (2008). In fact, we do not need a standard of review because we conclude that plaintiffs waived review of this issue for the reasons that follow. *See* N.C.R. App. P. 10(b)(1).

**LAIL v. BOWMAN GRAY SCHOOL OF MED.**

[196 N.C. App. 355 (2009)]

This Court has held that

> [a] ruling on a motion *in limine* is merely preliminary and not final. A trial court's ruling on a motion *in limine* is subject to change during the course of trial, depending upon the actual evidence offered at trial. For this reason, a motion *in limine* is insufficient to preserve for appeal the question of the admissibility of evidence. It follows that a party objecting to an order granting or denying a motion *in limine*, in order to preserve the evidentiary issue for appeal, is required to object to the evidence at the time it is offered at the trial (where the motion was denied) or attempt to introduce the evidence at the trial (where the motion was granted).

*Xiong v. Marks*, 194 N.C. App. 644, 647, 668 S.E.2d 594, 597 (2008) (citations, quotation marks and brackets omitted).

It may seem logical to make an exception to this rule in the case *sub judice* and review on the merits, because the trial court's ruling, based on lack of notice per Rule 32 of the North Carolina Rules of Civil Procedure, was not dependent on the actual evidence offered at trial and therefore was not "subject to change" during the course of the trial. However, we are bound by *Condellone v. Condellone*, a case where a "motion in limine" was also granted on the basis of a rule of civil procedure and would not have been subject to change during the course of the trial. 129 N.C. App. 675, 501 S.E.2d 690, *disc. review denied*, 349 N.C. 354, 517 S.E.2d 889 (1998).

In *Condellone*,

> Plaintiff made a motion *in limine* requesting the trial court to exclude any evidence that Plaintiff had cohabited with an adult male to whom she was not related or married, on the ground that cohabitation constituted *an affirmative defense which Defendant had not raised in his answers*. The trial court granted Plaintiff's motion *in limine*, and did not allow Defendant to present evidence of Plaintiff's cohabitation.

129 N.C. App. at 678, 501 S.E.2d at 693 (emphasis added). After the trial court granted the plaintiff's motion *in limine*, the "[d]efendant did not offer evidence of [p]laintiff's cohabitation at trial." 129 N.C. App. at 681, 501 S.E.2d at 695. On appeal, defendant assigned error to denial of the motion *in limine*. *Id.* This Court dismissed the assignment of error, holding:

A trial court's ruling on a motion *in limine* is preliminary and is subject to change depending on the actual evidence offered at trial. The granting or denying of a motion *in limine* is not appealable. To preserve the evidentiary issue for appeal where a motion *in limine* has been granted, the non-movant must attempt to introduce the evidence at trial. In this case, the trial court granted Plaintiff's motion *in limine* to exclude evidence of her cohabitation with an unrelated adult male. Defendant did not offer evidence of Plaintiff's cohabitation at trial, and thus has not preserved this evidentiary issue for appeal.

*Id.* (citations omitted). Accordingly, we dismiss this assignment of error.

### IV. Testimony of Dr. Steven Block

**[3]** Plaintiffs argue that the trial court committed reversible error by allowing defense witness Steven Block, M.D. to offer "surprise causation" opinions contrary to the written diagnosis and treatment records contained in the hospital records of defendant North Carolina Baptist Hospital on the grounds that Dr. Block was never properly designated as an expert witness.

Defendants urge us to dismiss this assignment of error on the basis that plaintiffs failed to properly preserve their objection to Dr. Block's testimony and thus waived appellate review under N.C.R. App. P. 10(b)(1). Defendants claim that plaintiffs in fact "actually invited the purported error" by agreeing with the trial court's ruling. (Emphasis in original.) Defendants further argue that if we consider the assignment of error on its merits, Dr. Block's testimony was admissible because "the treating physician . . . [has a] right to speak to the conclusions drawn [at the time of treatment]."

### A. Preservation for Appellate Review

At trial, defendants "tender[ed] Dr. Block as an [sic] neonatologist for the purposes of potential causation questions only." Plaintiffs objected based upon the fact that Dr. Block had not been identified as an expert witness by defendants. A lengthy bench conference ensued outside of the presence of the jury. At the end of the bench conference, the trial court ruled that Dr. Block "is the only one that I've seen thus far . . . who falls into th[e] category [of treating physician]. So . . . I'm going to allow him to testify." Plaintiffs' counsel responded, "I think that's fair, Judge. To the extent that [Dr. Block] treated the kid and where [defendants] showed that he was treating

this child, I think from that point forward he can testify to what his conclusions were and what his records show. So I agree."

Even though plaintiffs' restatement of and agreement with the trial court's ruling was not "invited error," *see, e.g., State v. Gobal,* 186 N.C. App. 308, 319, 651 S.E.2d 279, 287 (2007) ("invited error" arose from statements elicited by appellant on cross-examination at trial), *aff'd per curiam,* 362 N.C. 342, 661 S.E.2d 732 (2008); *State v. Yang,* 174 N.C. App. 755, 760, 622 S.E.2d 632, 635 (2005) ("invited error" arose from jury instructions appellant "helped craft at trial"), plaintiffs' counsel's comments did waive appellate review of Dr. Block's testimony insofar as it arose from his role as treating physician.

B. On the Merits

Plaintiff again failed to include a standard of review in his brief as required by Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure. Our research reveals that the admission or exclusion of opinion testimony, whether from a "fact" witness or an expert witness is reviewed only for abuse of discretion. *State v. Washington,* 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000), *disc. review denied,* 353 N.C. 396, 547 S.E.2d 427 (2001). Abuse of discretion means the trial court's decision is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hutchinson,* 139 N.C. App. 132, 137, 532 S.E.2d 569, 573 (2000) (citation and quotation marks omitted).

The record contains Defendants' Designation of Expert Witnesses, filed on 23 October 2006. The document designated "[a]ll treating physicians identified by plaintiffs, subject to objection[,]" but did not list Dr. Block by name. Dr. Block was further not listed as a witness by plaintiffs in the pre-trial order.

A plaintiff is entitled to a new trial if in response to a proper request he is not given "the opportunity to depose [all testifying expert witnesses] prior to trial and adequately prepare for his cross-examination." *Prince v. Duke University,* 326 N.C. 787, 790-91, 392 S.E.2d 388, 390 (1990); N.C. Gen. Stat. § 1A-1, Rule 26(b)(4). However, this rule does not apply to an " 'expert whose information was not acquired in preparation for trial but rather because he was *an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit.*' " *Turner v. Duke University,* 325 N.C. 152, 168, 381 S.E.2d 706, 715-16 (1989) (quoting N.C. Gen. Stat. § 1A-1, Rule 26(b)(4) comment (1983)) (emphasis added).

Plaintiffs acknowledge the treating physician exception recognized in *Turner*, but contend that the "exception [for treating physicians] is not without limits," specifically arguing:

> As a result of his participation in assisting the defense and his dramatically changed opinions as to causation, Dr. Block no longer fell within the ambit of a treating physician who may render opinions as to diagnosis and treatment actually rendered. Instead, he became a defense expert who proffered new and previously undisclosed opinions over fourteen years after the hospital records were completed.
>
> . . . .
>
> [Dr. Block] stepped far outside his limited role . . . when he took a position contrary to the hospital records that he himself had adopted and approved years earlier, but that also supported defense theories and strategies and offered opinions on why the earlier hospital records were incorrect as to the diagnoses. . . . [Dr. Block also] opined that [the hospital's] policy caused [the discharge summaries] to contain errors . . . .

Plaintiffs essentially urge us to find some gray area in *Turner* and to adopt an exception to the treating physician exception, to wit: that when a treating physician "t[akes] a position contrary to the hospital records that he himself had adopted and approved a year earlier" and also "support[s] defense theories and strategies," the treating physician is an expert who must be designated as such before trial. We disagree.

*Tzystuck v. Chicago Transit Authority*, 529 N.E.2d 525 (Ill. 1988), was cited with approval in *Turner*. 325 N.C. at 168, 381 S.E.2d at 716. The statement of the law in *Tzystuck* is instructive:

> While treating physicians may give opinions at trial, those opinions are developed in the course of treating the patient and are completely apart from any litigation. Such an opinion is not formed in anticipation of a trial, but is simply the product of a physician's observations while treating the patient, which coincidentally may have value as evidence at a trial. In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or partici-

pated in the transactions or events that are part of the subject matter of the litigation.

529 N.E.2d at 528-29.

Accordingly, we read the "treating physician exception" to be a bright line exception—either the physician is a treating physician, or he is not. Plaintiff concedes in his brief that Dr. Block was one of Chad's treating physicians; this ends the argument. Furthermore, even if we assume that there could be some searching inquiry which would divide a treating physician's testimony into admissible "treating physician" opinion and inadmissible "expert" opinion, none of the testimony *sub judice* fell "outside Dr. Block's role" as treating physician.

Dr. Block testified that at the time of the events giving rise to this lawsuit, he was an attending neonatologist and medical director of nurseries at NCBH. Dr. Block then explained the hospital rotation and call system to show that he was one of Chad's treating physicians even though his name did not appear on Chad's medical records. Dr. Block then took the jury step-by-step through Chad's treatment, including defining the relevant medical terms found in the hospital records.

Dr. Block testified that recurrent tension pneumothorax[2] led to hemorrhaging in the brain and ultimately to hydrocephalus. Dr. Block further testified that he did not agree with the discharge summary which stated "E. Coli sepsis and meningitis with pos[illegible] post-infectious leading to hydrocephalus[,]" because he felt the discharge summary was incomplete as to the cause of Chad's hydrocephalus.

Dr. Block explained the fact that the medical records stated an arguably incorrect diagnosis as follows:

> The department of pediatrics had a very strong, very autocratic chairman, and he had certain ironclad rules. And the rule was the discharge summary needed to be dictated before the chart left the floor, and that had to be within I think it was three to four hours after the baby went home. So there was a short window of time in which the house staff, the residents, had in which to get the discharge summary done.

---

2. A pneumothorax . . . is when "air leaks out into the space between the lung and the chest wall so that the underlying lung collapses" and may lead to a sudden drop in blood pressure or heart rate.

The activities of the unit don't stop. There are babies being admitted. There are babies requiring procedures. There are emergencies and crises that need to be taken care of and this discharge summary. So in a somewhat rushed fashion . . . the residents would take this large chart, often to be about 12 to 15 inches tall, weigh about 30 pounds, and page through this rapidly taking notes as they go along, and then from their notes dictate as quickly as possible the discharge summary, which is then transcribed. . . . In that hurried process, it was less than perfect. Errors occurred. . . . The resident may or may not have had an opportunity to review it. And in this particular case, Dr. Wadsworth, who dictated it, never signed it, so I know she never reviewed it.

[I]t's a very disorganized note. So within the respiratory distress syndrome section they talk about hydrocephalus requiring a shunt, but they don't comment there at all why the hydrocephalus occurred.

. . . .

It says, [p]rematurity, respiratory distress syndrom, E. Coli sepsis and meningitis and hydrocephalus, *without any mention of the hemorrhage which actually caused this*. . . . [W]hat can I say? It's wrong.

(Emphasis added.)

We conclude that all of Dr. Block's testimony, including his testimony about why discharge summaries sometimes contain errors and omissions, was derived from his participation, as treating physician, in the events that gave rise to this lawsuit. As such, Dr. Block was excluded from mandatory designation as an expert witness. Furthermore, Dr. Block was included in a class of persons named in the Defendants' Designation of Expert Witnesses, even if he was not specifically named. This case is distinguishable from *Prince*, where the testifying physician performed the autopsy, but never "treated" the patient, which *Prince* noted must occur while the patient is still alive. 326 N.C. at 790, 392 S.E.2d at 390. This assignment of error is without merit.

### V. Rebuttal Testimony of Dr. Karotkin

[4] Plaintiffs next argue that the trial court committed reversible error by excluding the rebuttal testimony of Edward Karotkin, M.D.

which was proffered by the plaintiffs to rebut the testimony of Dr. Block. Specifically, plaintiffs argue that "[a]fter the Court erroneously allowed Dr. Block to testify about a new theory of causation when defendants never designated him as an expert who would testify as to causation, plaintiffs attempted to soften the prejudicial blow of such testimony by calling Edward Karotkin, M.D. . . . as a rebuttal witness." Plaintiffs asked to have Dr. Karotkin testify on rebuttal as to (1) a diagram which Dr. Block drew during his testimony to illustrate his testimony as to Chad's injuries, and (2) Dr. Block's testimony that "the medical records were just wrong and the reasons that he gave for the medical records being incorrect."

Plaintiffs argue that "following the surprise testimony claiming the invalidity of the diagnosis contained in the medical records, Dr. Karotkin's rebuttal testimony was necessary to remedy the prejudice suffered by the plaintiff and went directly to the evidence presented by the defendants." Plaintiffs' brief goes on to stress cases, e.g., *Green v. Maness*, 69 N.C. App. 292, 316 S.E.2d 917, *disc. review denied*, 312 N.C. 622, 323 S.E.2d 922 (1984), which have addressed issues of "late-breaking discovery and unfair surprise" in expert medical testimony as to causation.

Defendants rely on *Harris v. Miller*, which found no abuse of discretion when the trial court excluded "rebuttal" testimony which was needlessly cumulative. 103 N.C. App. 312, 330, 407 S.E.2d 556, 566 (1991), *rev'd on other grounds*, 335 N.C. 379, 438 S.E.2d 731 (1994). Defendants argue that Dr. Karotkin had already testified on plaintiffs' behalf and plaintiffs sought simply to "repeat his causation opinions."

The standard of review of the trial court's ruling upon admissibility of testimony by a rebuttal witness is abuse of discretion. *Williams v. CSX Transp., Inc.*, 176 N.C. App. 330, 338, 626 S.E.2d 716, 724 (2006). "In determining relevant rebuttal evidence, we grant the trial court great deference, and we do not disturb its rulings absent an abuse of discretion and a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation and quotation marks omitted).

"Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981) (citations omitted). Rebuttal evidence is still subject to the Rules of Evidence.

*Hutton v. Willowbrook Care Center, Inc.*, 79 N.C. App. 134, 137-38, 338 S.E.2d 801, 803-04 (1986) (no error to exclude "rebuttal" evidence which was needlessly cumulative or reversibly prejudicial).

In plaintiffs' proffer of Dr. Karotkin's testimony as to the medical records, Dr. Karotkin stated that Dr. Block's explanation of errors and omissions in the discharge summary was "not a very good excuse." Dr. Karotkin also stated that there is a "universal convention" that if a medical record contains an error, the doctor should "draw a line through it and make a notation that this is an error, put [his] name on it, and then . . . [rewrite] it, and date the note at the time [he] wrote the note." Dr. Karotkin also would have testified that when a doctor signs a discharge summary, "it is very much like reading a contract or taking out a loan or buying a car; when you sign the document, you're agreeing to what the text says above your signature."

After extended arguments by counsel, the trial court determined that Dr. Block's diagram was new evidence and allowed rebuttal testimony from Dr. Karotkin as to Dr. Block's diagram. However, the trial court ruled that testimony as to Dr. Block's explanation of the medical records would be excluded. The trial court announced the basis for its ruling:

> [T]he accuracy of the records, I'm not going to allow [Dr. Karotkin] to testify about that. I mean, what can he say that's going to make it better, [or] any worse for anybody? . . . Dr. Block [testified to] the procedure that [the hospital] had to get [the records] done. . . . [I won't allow] you to put somebody up here to talk about [something] that doesn't add anything to the case in my view as far as rebuttal is concerned. . . . [A]s long as [Dr. Karotkin's rebuttal testimony] touches upon [Dr. Block's diagram] . . . the Court will allow it.

It appears that the trial court excluded the testimony about the medical records on the basis of Rule 403, that the probative value of the evidence was "substantially outweighed . . . by considerations of . . . undue delay, . . . or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403; *see also Hutton*, 79 N.C. App. at 137-38, 338 S.E.2d at 803-04.

As discussed in *supra* Part II, plaintiffs had objected to Dr. Block's testimony and later argued that Dr. Karotkin's testimony was made necessary on the grounds that Dr. Block was offering an *expert opinion on causation* without having been identified prior to trial as an expert witness. However, Dr. Block's testimony as to the erro-

neous discharge summary was *not* expert opinion testimony regarding causation and not testimony that would have possibly been subject to plaintiffs' objection to Dr. Block's testimony—it was simply factual testimony by a treating physician about Chad's diagnosis, the method of preparation of the medical records and why he considered that the records contained serious omissions. Therefore, Dr. Block's testimony as treating physician did not necessitate expert rebuttal.

Furthermore, the trial *sub judice* had already lasted nearly three weeks when Dr. Karotkin was proffered as a rebuttal witness. The jury had already heard Dr. Karotkin's extensive prior testimony regarding his certainty as to the accuracy of the medical records.

In sum, "[t]he transcript shows that the trial court carefully considered each part of [Dr. Karotkin's proffered] testimony." *State v. Bagley*, 183 N.C. App. 514, 522, 644 S.E.2d 615, 621 (2007). The trial court excluded Dr. Karotkin's testimony about the accuracy of the medical records as needlessly cumulative and time-wasting. However, the trial court did allow rebuttal testimony regarding Dr. Block's diagrams, which it considered new evidence in the case. "Neither the substance of th[e rebuttal] evidence, nor the careful procedure by which the trial court considered this evidence outside the presence of the jury, suggests that the trial court made an arbitrary or unreasonable decision. Accordingly, we find no error[.]" *Id.* This assignment of error is overruled.

## VI. Testimony of Dr. Cotten

**[5]** Plaintiffs next argue that the trial court erred by failing to strike the testimony of Charles M. Cotten, M.D. because Dr. Cotten "applied the incorrect standard of care" to Dr. Martha Simpson's treatment of Chad. Plaintiffs state that "[p]rior to the commencement of the trial, counsel stipulated that the standard of care applicable to Dr. Simpson was that of a neonatologist." Plaintiffs further argue that "Dr. Cotten's testimony regarding an unidentified standard of care applicable to Dr. Martha Simpson was irrelevant." Alternatively, plaintiffs argue "[e]ven if Dr. Cotten's testimony was relevant for any purpose other than proving Dr. Simpson's conformity with the applicable standard of care, it should have been excluded" because it "risked misleading the jury[.]"

### A. Standard of Review

Plaintiff has again failed to state the standard of review. We find that where "testimony is first admitted without objection, a subse-

quent motion to strike the testimony is addressed to the sound discretion of the court and its ruling will not be disturbed unless an abuse of discretion has been shown." *Invesco Financial Services, Inc. v. Elks*, 29 N.C. App. 512, 513, 224 S.E.2d 660, 661 (1976).

B. Pertinent Facts

In Dr. Cotten's deposition, plaintiffs' attorney specifically asked:

Q. All right. When you say that Martha Simpson complied with the standard of care, define that for me. Define for me what you mean by the standard of care, please.

A. What a reasonable neonatologist, or not neonatologist, what a reasonable person caring for a baby like Chad Lail would do given his circumstances.

On direct examination at trial, without objection from plaintiffs, defendants asked Dr. Cotten:

Q. [D]o you believe you're familiar with the standard of care applicable to Dr. Simpson as she worked at Forsyth Medical Center in 1991, January 1991?

A. Yes.

. . . .

Q. Based on your review of the medical records, all of your clinical training and experience and all of your research, do you have an opinion to a reasonable degree of medical certainty and satisfactory to yourself as to whether or not Dr. Simpson complied with the standard of care in her treatment of Chad Lail.

A. I believe she did.

Defendants then asked Dr. Cotten a long series of questions, with only one unrelated objection from plaintiffs, as to Chad's specific symptoms and the appropriateness of specific treatments rendered by Dr. Simpson. At the end of the series, defendants asked Dr. Cotten, again without objection from plaintiffs:

Q. Do you have an opinion as to whether Dr. Simpson exercised reasonable care and diligence in the application of her skill and knowledge to the care and treatment of Chad Lail?

A. I believe she did.

Q. Doctor, do you believe Martha Simpson complied with the standard of care in her treatment of Chad Lail?

A. I believe she did.

Despite these and other references to the standard of care rendered in various stages of Chad's treatment, plaintiffs point to no portion of Dr. Cotten's testimony on direct examination, and we find none, where he *defined* the standard of care he was using.

On cross-examination, plaintiffs' counsel asked Dr. Cotten a series of questions about his prior deposition testimony, stating, "I'm going to read the questions and you read your answers in your deposition." In the midst of cross-examining Dr. Cotten based on his deposition, the following series of questions and answers ensued:

Q. Now, you agree, do you not, sir, that if a resident fails to call an attending under the facts of this case to report the respiratory distress, that that attending [sic] breached the local standard of care, true?

A. No I don't.

[DEFENSE COUNSEL:]  Object to form.

A. The way you worded your question? How was it you worded that in the deposition?

Q. Let's look [at] how it was worded in the deposition. If I misworded it—

A. I think you said that the attending breached the standard just now.

Q. Do you agree that if the resident fails to call an attending under facts similar to these, that that resident breached the local standard of care.

[DEFENSE COUNSEL:]  Object.

A. Do you agree with that?

[DEFENSE COUNSEL:]  Objection to the form.

THE COURT:  Overruled.

A. I agree we talked about it at the deposition and that I said that I agreed with it as part of the standard of care during the deposition. But I also think that it's important in the deposition— and we went back and forth several times about clarification of standard of care versus expectations of residents . . . . I know we went back and forth and it was very unclear . . . in my mind

how to make that distinction between standard of care and standard of expectations that we would expect a resident to call us, an attending.

Q. All right, sir. When you say that Martha Simpson complied with the standard of care in this case, you don't mean the standard—you didn't mean—*when you had those opinions in your deposition,* you didn't mean that she complied with the standard of care for a neonatologist, true?

[DEFENSE COUNSEL:] Objection.

A. That's correct.

THE COURT: Overruled.

Q. You mean she complied with the standard of care for a reasonable person under the circumstances, true.

A. Or a reasonable—

[DEFENSE COUNSEL:] Object.

A. —physician, a well-trained physician, in the circumstances.

THE COURT: Overruled.

[PLAINTIFFS' COUNSEL:] Judge, based on that I move to strike his opinions on standard of care, and we can be heard later.

(Emphasis added.) Plaintiffs' counsel continued his questioning of Dr. Cotten for another 13 transcript pages. After the completion of Dr. Cotten's testimony, plaintiffs' counsel was heard on his motion to strike Dr. Cotten's testimony. Plaintiffs' counsel stated that he moved to strike "simply based upon the fact that the witness testified he didn't apply the standard of care that has been stipulated[3] is the standard of care that's applicable to this doctor[.]"

---

3. In their brief, plaintiffs did not reference the transcript or record for any stipulation that the standard of care would be that of a neonatologist. No such stipulation is in the Pre-Trial Order. In fact a long discussion as to the standard of care ensued as plaintiffs were heard on their motion to strike. The only reference we were able to find to a "stipulation" was the trial judge's comment: "[T]his goes back to about two weeks ago. I asked everybody and everybody told me, no, she's held to the standard of care of neonatologist." However, the trial judge later acknowledged confusion over the standard of care: "The [confusion] was whether or not it was standard of care of a pediatrician, third-year pediatrician or a neonatologist."

In the jury charge, the trial court instructed, without objection:

The law in the state of North Carolina holds that resident physicians who manage care in the place of the attending physician caring for the patient are under a duty to bring the patient the level of care of an attending physician. In the matter at

LAIL v. BOWMAN GRAY SCHOOL OF MED.

[196 N.C. App. 355 (2009)]

Plaintiffs argued to the trial court that Dr. Cotten had admitted that he used the wrong standard of care, not just in his deposition testimony, but also in his trial testimony. Plaintiffs' counsel insisted that

I asked [Dr. Cotten] the question: In this case you did not apply a standard of care of what a reasonable and prudent neonatologist would do in this case, true? True. And for that reason I move to strike his testimony based upon the stipulation of counsel as it relates to standard of care obviously, not the causation.

Defendants' counsel argued that Dr. Cotten was referring only to the standard of care he used in his *deposition* testimony. Plaintiffs' counsel responded, "I know exactly what I asked. I said, In your deposition *and in fact here you have* . . . then the question. And the record will reflect that." (Emphasis added). However, the record does not reflect that. The record, as emphasized above, reflects that plaintiffs' counsel's question was directed only to Dr. Cotten's testimony in his deposition and not at trial.

The trial judge stated his initial reaction to plaintiffs' motion and took the motion under advisement pending plaintiffs' tender of legal authority: "In direct examination he asked . . . standard of care questions of Dr. Cotten. Dr. Cotten gave his opinions. There's no objections to those questions. They all came in." When the trial judge later ruled on plaintiffs' motion he specifically said, "I'm going to deny the motion to strike his testimony. I believe his testimony came in during direct examination without objection. Later on cross-examination you asked him a question concerning what standard of care he was applying."

C. Legal Analysis

Certainly it was proper for plaintiffs to point out this discrepancy between Dr. Cotten's deposition testimony and his trial testimony for purposes of impeachment, but the record simply does not support plaintiffs' argument for their motion to strike. Dr. Cotten's extensive trial testimony on the standard of care was admitted without objection. Dr. Cotten was never asked, and never expressed the standard of care he was applying in his trial testimony. Accordingly, we find no abuse of discretion in the trial court's denial of the motion to strike. This assignment of error is overruled.

---

hand, the evidence has shown that the attending physicians were specialists in the field of neonatology. Therefore, the duties applicable to the resident physician in this matter are that of a neonatologist.

AZALEA GARDEN BD. & CARE, INC. v. VANHOY

[196 N.C. App. 376 (2009)]

VII. Motion for New Trial

**[6]** Plaintiffs finally argue that the trial court abused its discretion and erred by its denial of plaintiffs' motion for a new trial based upon "numerous irregularities and inequities that prevented the plaintiff[s] from receiving a fair trial." However, plaintiffs make no substantive argument regarding any legal basis for a new trial, and their motion for new trial referred generally to the same issues as we have previously considered above. As we have found no error in the trial court's ruling on the issues presented on appeal, and plaintiffs have failed to argue any other basis for a new trial, this assignment of error is without merit.

Plaintiffs' additional assignments of error, numbers 5, 9 and 11, were not argued in plaintiffs' brief and are therefore deemed abandoned. N.C.R. App. P. 28(b)(6).

For the reasons stated above, we find that plaintiffs received a fair trial, free of reversible error and we affirm the judgment of the trial court.

AFFIRMED.

Judges WYNN and CALABRIA concur.